GEORGE OSTRAND v. VILLAGE OF NORTH ST. PAUL.

147 N. W. (2d) 571.

December 30, 1966—No. 40,017.

*Seldon H. Caswell,* for appellant.
*John E. Daubney,* for respondent.

THOMAS GALLAGHER, JUSTICE.

This action is for a declaratory judgment that plaintiff, George Ostrand, as owner of certain property in defendant village is entitled to a permit from defendant to construct an apartment building thereon. After defendant's denial of the application for such permit, this action in the district court was instituted. Therein the court held that defendant's actions were arbitrary, capricious, and unlawful, and that the zoning ordinance upon which they were based in so far as it applied to plaintiff's property deprived him of it without due process. This appeal is from an order denying defendant's motion for a new trial.

Plaintiff, a general contractor and real estate developer, purchased the property on May 12, 1962. At that time under Ordinance No. 169 it was zoned as class C residential property which authorized its use for multiple-residential purposes if a special permit therefor was obtained from the village council. Plaintiff was then advised that the village was

contemplating a new comprehensive zoning ordinance which, if adopted, would limit the use of plaintiff's property to single-family dwellings. He was advised, however, by the village manager, Mr. Orville Johnson, that, if prior to the adoption of this ordinance a permit for multiple-dwelling use were granted him, the construction of such multiple dwellings would be valid under a contemplated nonconforming-use clause in the new ordinance.

On May 21, 1962, plaintiff made application for the permit to construct a multiple dwelling on his property under the ordinance then in existence. He also petitioned for certain improvements on the property, including the installation of sewers, water mains, sidewalks, and alleys, and for street surfacing. On that date the village council determined that a public hearing on both applications should be held on June 4, 1962. On May 24 defendant's village manager wrote plaintiff as follows:

"This is to advise you, and others, that the present zoning of Lots 15 thru 28, Block 3, Fourth Addition to North St. Paul, is Class 'C' residence. This allows the construction of apartment buildings.

"We hereby acknowledge your petition for certain improvements on Fourteenth Avenue, such as sewer facilities, water facilities, street surfacing and other associated improvements along with your petition to construct apartment buildings on these particular lots. This will advise you that a hearing * * * will be held on June 4, 1962.

"We call to your attention that a new zoning ordinance is being proposed. The proposed zoning for the above lots will not allow apartment buildings. However, the following conditions will no doubt be contained in the proposed ordinance regulations;

" 'Any structure which will, under this ordinance, become non-conforming but for which a building permit has been lawfully granted prior to the effective date of this ordinance or of amendments thereto, may be completed in accordance with the approved plans; provided construction is started within six (6) months of the effective date of this ordinance or amendment thereof and continues to completion within two (2) years. Such structure shall thereafter be a legally existing non-conforming structure.' "

At the hearing on June 4, 1962, no evidence was presented with respect to the need for limiting the use of plaintiff's property to single-family residences or to indicate that if a multiple dwelling were erected thereon problems as to public health, safety, or welfare would arise. Notwithstanding this and notwithstanding that plaintiff's application and proposed plans and specifications were consistent with the zoning ordinance then in effect and met all requirements of defendant's building code, his application for the multiple-dwelling permit was denied "for the best interests of the Village." At the same time the village granted his application for the installation of the utilities and other improvements. On July 23, 1962, the village adopted the new master zoning ordinance which became effective on August 29, 1962. As stated above, this limited the permitted use of plaintiff's property to single-family residences although it was established that a recommendation of the village planner indicated that multiple-resident development in the location of plaintiff's property would be practical.

The present action was commenced after the denial of plaintiff's application described. At the trial it was established that plaintiff's property had a value of $33,000 for multiple-resident purposes and only $18,000 for single-family residential construction. In a memorandum opinion, the court stated:

"* * * He [plaintiff] purchased the subject property on May 12, 1962. At about the same time * * * Orville Johnson, the Village Manager * * * informed plaintiff that as a part of the new master plan and proposed zoning ordinance a provision would be included providing that if a permit was granted prior to the adoption of the new zoning ordinance, and if work was commenced within six months after the permit was granted and completed within two years after the permit was granted, the new construction would then have a valid non-conforming use existence and would be permitted that usage. This provision was subsequently incorporated into the ordinance * * *.

* * * * *

"* * * Ordinance No. 288 [requiring special permit from village council for multiple dwellings] simply states that for certain uses a

special permit is required, which apparently may or may not be issued after a public hearing. * * * [T]here is no standard or criterion set forth in Ordinance No. 288 concerning the requirements that must be met to obtain a special permit. * * * [T]here is no procedure set forth in Ordinance No. 288 as to what is to be presented at the public hearing or how it is to be presented. Ordinance No. 288, to say the least, leaves much to be desired. * * *

"* * * [T]he action of the council * * * in denying the plaintiff's application for a special permit * * * must be based upon evidence presented at the time and what was done and what was not done. The minutes of the council meeting * * * show that the * * * application was 'denied for the best interests of the village.' The minutes reflect that abutting property owners objected * * *. Objection was also voiced that the proposed multiple dwellings would depreciate property values * * *."

"* * * Ordinance No. 320, effective August 15, 1960, [added] a new section [to Ordinance No. 169] as follows:

"'* * * All buildings and premises hereafter shall be limited to those uses which appear for the first time in each district unless the Village Council upon written application for a change in use approve the same by a two-thirds vote. The Village Council may refer the written application to the Planning Commission for recommendation.'

* * * * * *

"* * * Precisely what is meant or intended by Ordinance No. 320 is unclear. * * * Fairly construed, it [No. 320] appears to be an effort to freeze all zoning as of a certain date unless the council decides otherwise. * * * [I]t appears to be an effort to grant no permits until the new zoning laws went into effect. * * * It seems apparent that this ordinance was of the type described and condemned by our Supreme Court as a hold type or stopgap pending adoption of a comprehensive rezoning ordinance in Alexander v. City of Minneapolis [267 Minn. 155] 125 N. W. 2d 583.

"* * * Here Ordinance No. 320 was enacted on August 15, 1960, and the new zoning ordinance, No. 337 * * * was enacted July 23, 1962. A period of approximately two years is not deemed to be a short

period of time. As applied to plaintiff's application, there is no rational conclusion other than that Ordinance 320 is invalid."

After consideration of the evidence and because of the absence of anything to justify defendant's position, the court remanded the case for an additional hearing by the village council. This hearing was held by the council on August 10, 1964. Written reports from the police, fire, health, and engineering departments of the village and from its planning board and professional planner were submitted as evidence at this hearing. These reports were made part of the minutes of this meeting. In them there is no indication that any problems as to health, safety, or public welfare would arise in case the proposed construction were completed. At the close of this meeting the council again denied plaintiff's application, this time on the ground that the granting of the permits would "create problems of safety, traffic and the present and future development of our village," and such problems would "endanger the safety and welfare of the Village."

On November 5, 1964, the district court proceedings were reopened and after considering the evidence submitted at the August 10, 1964, hearing, the court determined that the action of the village in denying plaintiff's application was arbitrary and illegal because not based upon any valid considerations of health, safety, or welfare. In a memorandum opinion the court stated:

"The report of the chief of the fire department is to the effect that they find no special fire hazard in connection with the erection of the building; that the water supply is good and that there are no road hazards. The report of the health officer is that the proposed apartments must be connected to a sanitary sewer and waste disposal, must be in accord with existing ordinances, and if these requirements are met the health officer can find no medical contradiction to the use of this land for apartments. It is understood that the project contemplates connection with the sanitary sewer and waste disposal in accordance with existing ordinances. The report of the chief of police is concerned with off-street parking, traffic and creation of play areas for children. * * * It is understood that as to the ordinances in existence in June, 1962, the

Ostrand application met the off-street parking requirement. In addition, it appears that Ostrand states that the plans for the alley access would be amended to use the 60 feet wide 14th Avenue instead of 20 feet wide alley. * * * It would seem that the problems of access and off-street parking were adequately met. The next subject was that of traffic. * * * It must be recognized that traffic has been on the increase regardless of the kind of construction. It would seem that any consideration of traffic will always be a relative one. The fact of increased traffic, if it be a fact, standing alone, cannot thwart the expansion and new construction necessary to accommodate our increasing population. The existence of play areas as a part of multiple dwelling construction certainly is desirable but no such requirement exists in the previous or present ordinances. * * * While due deference must be had to the views of the planning commission, it is apparent that the views expressed are not based upon the situation as it was in June, 1962, but rather as it appears at the present time. The Ostrand property was zoned Class 'C' in June, 1962, * * *. * * * Unless and until it is shown that the proposed multiple dwelling jeopardizes the public health, safety or welfare, Ostrand is entitled to have his application granted. * * * In the absence of any persuasive evidence that the proposed construction will jeopardize the public health, safety or welfare, the Court is compelled to find that in the denial of the application the council acted arbitrarily, capriciously and unlawfully, and it must therefore be ordered that the application be granted."

■ We are in accord with the court's determination that defendant acted arbitrarily and unlawfully in denying plaintiff's application for a permit to construct a multiple-dwelling structure on his property. His application met all existing standards of the building and zoning ordinances of the village then in effect and appears to have been rejected principally because of neighborhood opposition. In denying it, the village council did not follow the recommendations of its planning commission or consider the reports of its police, fire, or health departments to the effect that no potential hazards would follow if an apartment building were constructed on plaintiff's property. The only other evidence received at the hearing were statements of property owners whose properties were adjacent to plaintiff's property to the effect that in their

opinions their properties might be devalued if the permit were granted. Such argument has no legality. Alexander v. City of Minneapolis, 267 Minn. 155, 125 N. W. (2d) 583; Olsen v. City of Minneapolis, 263 Minn. 1, 115 N. W. (2d) 734. As stated in the Olsen case (263 Minn. 11, 115 N. W. [2d] 741) —

"* * * here it seems obvious that the city's underlying motive in denying plaintiff the permit was its conclusion that the operation of a gasoline filling station in the location described would violate the 'neighborhood concept' which it sought to insure. The determination of plaintiff's rights on such a basis cannot be permitted. It is settled that purely aesthetic considerations do not form a sound basis for nullifying or destroying definite or valuable interests in property without compensation therefor to the owner. * * * One who has acquired property zoned for particular purposes under a comprehensive zoning ordinance should be entitled to rely thereon as against the arbitrary enactment of amendments thereto which result in the diminution in value or the restriction of his rights and interests in such property."

■  With respect to the special permit required, it is significant that the ordinance in question established no criteria or standards of procedure under which such permits would be granted or denied except that it would be after a hearing before the village council. After such a hearing plaintiff's application was denied, and as indicated, no valid reason for this was given by the council. It seems clear to us, as it did to the trial court, that in denying the application the council acted in an arbitrary and capricious manner and without justification for denial under the special permit ordinance. As stated in Olsen v. City of Minneapolis, 263 Minn. 1, 8, 115 N. W. (2d) 734, 739:

"* * * In deciding this question, the council does not have the authority to deny a special permit merely because it may disagree with some preceding council in its determination that classification of plaintiff's property under a zoning ordinance for commercial purposes was justified. The council as now constituted is bound by the comprehensive zoning classification, subject only to the exception that, if there is evidence that a nuisance will result from a commercial use in a particular

neighborhood, in its discretion it may deny an application for special permit to conduct the business which would constitute a nuisance there."

The language of Ordinance No. 320, upon which the council determined that existing zoning ordinances could be ignored until action was taken upon the contemplated general comprehensive zoning, is indefinite. We are inclined to agree with the trial court's concept of it as a "stopgap" ordinance, although its language makes any conclusion as to its meaning extremely uncertain. It was adopted August 15, 1960, almost 2 years before the new zoning ordinance was adopted. As the trial court stated, "[I]t appears to be an effort to freeze all zoning as of a certain date unless the council decides otherwise." We have held that an ordinance of this kind constitutes taking of property without due process contrary to constitutional requirements. In such light it must be held irrelevant in the present proceedings. See, Alexander v. City of Minneapolis, 267 Minn. 155, 125 N. W. (2d) 583.

The order appealed from is affirmed.

Affirmed.