## EARLE ALMQUIST v. TOWN OF MARSHAN.

245 N. W. 2d 819.

April 2, 1976—No. 44599.

*Dorsey, Marquart, Windhorst, West & Halladay, Edward J. Schwartzbauer, Robert L. Hobbins,* and *Harry P. Schoen,* for appellant.

*Crawford, Anderson & O'Connor, Broeker, Bachman & Zerby, Arata, Misuraca & Clement, Malcom A. Misuraca,* and *Robert H. Freilich,* for respondent.

*Stanley G. Peskar,* for League of Minnesota Municipalities, amicus curiae, seeking reversal.

OTIS, JUSTICE.

This is an action brought by respondent, Earle Almquist, for a declaratory judgment requiring appellant, Town of Marshan, to issue plaintiff a special-use permit authorizing him to develop 26 2½ acre lots for the construction of dwellings on 82½ acres of land owned by him in Marshan Township, Dakota County. The trial court granted plaintiff the relief he sought. We reverse and remand for a new trial on the limited issue of whether the town's moratorium on development was unconstitutionally applied with respect to respondent.

At the outset, we feel compelled to observe that neither the authority which Almquist sought to obtain from Marshan nor the issues litigated in the trial court are clearly defined. We are accordingly handicapped at the appellate level in determining precisely what issues are before us. However, in the course of the extensive oral argument which we granted, two issues appeared to emerge. First, where a landowner has sought for 6 months to obtain approval by a municipality of a proposed plan or plat for development, does the municipality have the power

thereafter to impose a 6-month moratorium on development pending the adoption of a comprehensive zoning plan? The trial court held that under these circumstances the owner had an "absolute" right to rely on the zoning in effect at the time he made application for approval of his plan or plat. We reverse as to this issue and hold that, subject to the restrictions hereinafter discussed, a municipality does have the power to impose a moratorium of limited duration.

The second issue, which was not reached by the trial court, is whether, as applied to this landowner, the moratorium was valid or whether its effect on him had such harsh and unjust consequences as to constitute "substantial prejudice" within the meaning of Hawkinson v. County of Itasca, 304 Minn. 367, 231 N. W. 2d 279 (1975), which would require either that the moratorium not be applied to this landowner or, if applied, that he be compensated for any damages which result to him. We hold that the record before us does not support a finding of substantial prejudice; but, because the trial court limited the issue to "whether or not the denial in the form of a moratorium is a reasonable police power measure necessary to the public safety, health or welfare of the community," respondent may not have felt it necessary to present available evidence concerning the impact of the moratorium with respect to his particular situation. Accordingly, the new trial will be directed to that issue.

Earle Almquist has since 1964 owned 750 acres of farmland in Marshan Township, south of the city of Hastings in Dakota County. In March 1972, he instituted proceedings to obtain permission from the Marshan Town Board to develop 82.5 acres by subdividing them into lots of 2½ acres each. The property was at that time zoned "P-O-C. Public, Open Development and Conservation and Reclamation Districts." The ordinance further provided, in § IVb (Town of Marshan Zoning Ordinance, Ordinance No. 2, 1967):

"Any of the following additional uses are permitted only if

a special use permit therefor is secured as provided in Section 29 hereof.

"1.   Non-farm one-family dwellings."

Section XXIIa provided:

"1.   P-O-C Districts. Twenty (20) acres for general farm dwellings and accessory buildings and two and one half (2½) acres for dwellings on small berry and fruit farms and truck gardens, and for non-farm dwellings."

Section XXIXd provided:

"A special use permit shall be applied for and shall be issued for such buildings and uses as are permitted in various districts only after securing such a special use permit, as provided herein. The zoning administrator shall receive such applications, shall refer them to the board of appeals for approval or disapproval, and if approved, shall refer them to the Town Board. The Town Board upon approval shall order the zoning administrator or the building inspector to issue such special use permits after securing written agreements, or other required assurance of faithful observance of such conditions as may have been established in the Town Board action."

It is of some significance that throughout much of the process which followed, Almquist was without legal counsel. He did not actually apply for a special-use permit until October 17, 1972, when the town adopted its moratorium. What he sought was in effect a preliminary approval of a plan or plat on which ultimately a special-use permit might be predicated. The remarks of counsel for the town in his presentation to the trial court at the conclusion of the evidence disclose the confusion and uncertainty of the posture of Almquist's application. Counsel pointed out to the trial court that Almquist was not asking approval of a plat but only approval of a plan. There was no request by him for a special-use permit to construct a nonfarm one-family dwelling. He was free to sell 2½-acre lots, leaving to purchasers the re-

sponsibility for obtaining permits. It was counsel's position that the real purpose of the procedure was to induce the town to accept and maintain roads which he planned to open in the proposed development.

In his presentation to the trial court, counsel for Almquist stated that he was asking for permission to go ahead with the development plan without platting since the ordinance did not require it. He reiterated the relief sought in the complaint—to proceed with the proposed development with or without a plat and without being restricted by the October 17 moratorium. No mention of a special-use permit was made either in the plaintiff's prayer for relief or in his counsel's closing argument other than his statement to the court that he was asking "for that approval necessary to go ahead with this project," because if nothing were done except to construct roads, "there is no indication that he will ever get a building permit to build a home."

It appears without dispute that between March 7 and October 17, 1972, Almquist met with the town planning commission on three occasions and with the town board on three other occasions. During that time he retained a land surveyor who assisted him in drafting the plan for the proposed development. However, apart from the time and effort which he himself expended, he testified that his actual costs amounted to only $3,000.

After considerable correspondence and discussion with the planning commission and town board, and after a number of revisions of the proposed plan, the board had no further objection to the plan and Almquist was permitted to present his application to the town board meeting on October 17, 1972. It was at that meeting when, for the first time, he sought a special-use permit.[1] The town board at that meeting neither granted nor denied

---

[1] Although the trial court made a finding that Almquist applied for a special-use permit in April 1972, his own testimony is to the contrary. On cross-examination he was asked:

"Q. Well, prior to October 17, 1972, did you ever make a request for a building permit?

the application but instead adopted a moratorium on further development for a 6-month period, ending April 17, 1973. The moratorium was subsequently extended for 1 month, and the new zoning ordinance adopted on June 19, 1973.

On June 19, 1973, the township of Marshan adopted a new zoning ordinance and a "Community Development Plan." [2] Under the new ordinance, Almquist's property is zoned "A-II Agricultural Preservation." The purposes, permitted uses, and performance standards under A-II are as follows:

"PURPOSE

"Agricultural Preservation areas are established in rural areas for the purpose of: protecting viable agricultural lands from non-farm influence; retaining valuable areas for conservational purposes; preventing scattered non-farm growth; preserving a secure economy in governmental expenditures for public serv-

---

"A. Prior to that?

"Q. Yes.

"A. No.

"MR. O'CONNOR: On this land?

"MR. SCHOEN: On this land.

"THE WITNESS: No.

"By Mr. Schoen:

"Q. The subject matter of this lawsuit?

"A. No.

"Q. And on October 17th, with your attorney at that point, you did make a request after the Town Board had said they had a moratorium going into effect?

"A. A request for what?

"Q. For a building permit?

"A. Yes.

"Q. And did you ever make application for a special use permit in connection with that building permit?

"A. Special Use Permit?

"Q. Yes.

"A. No."

[2] Attached as an appendix are pertinent portions of the plan.

ices, utilities and schools and deterring abuse of water and other natural resources of the community.

"PERMITTED USES

"Agricultural Land Uses.

Farmstead Residences.

Forestry and Nurseries.

Seasonal Produce Stands.

Telephone, Telegraph, and Power Transmission Lines and Necessary Appurtenant Structures.

Public Recreation.

\*    \*    \*    \*    \*

"A-II   PERFORMANCE STANDARDS

\*    \*    \*    \*    \*

"5.   Lot Area Regulations:

"a.   Every lot or plot of land on which a one family dwelling is erected shall contain an area of not less than ten (10) acres of farmable land.

"b.   Every lot or plot of land on non-farmable land on which a one family dwelling is erected shall contain an area of not less than five (5) acres and shall be on platted lots only."

Because, as we have indicated, the trial court held the moratorium invalid on May 15, 1973, the validity of the new ordinance was not litigated although the order denying amended findings or a new trial was not entered until after the adoption of the ordinance.

The trial court made the following findings:

"That the action of the Town Board with respect to this application was arbitrary, capricious and unreasonable.

"The evidence before the Court establishes that Plaintiff's requested use is compatible with the basic use authorized within a P-O-C zone, is in complete harmony with the intent and purpose of the zoning ordinance and in no manner endangers the public health, safety or general welfare of the Town of Marshan or any resident of that community."

The findings were accompanied by the following memorandum:

"Unlike the situation where an application is made for a variance or change in zoning Plaintiff in this case seeks to obtain a permit to use his land for a purpose expressly permitted by the zoning ordinance.

"Nothing in the record reasonably tends to show that the construction and maintenance of the proposed subdivision is liable to work any injury, inconvenience or annoyance to the community or any person.

"Accordingly, the Court must recognize the absolute right of an individual to rely upon zoning in effect at the time he makes application for a use contemplated under a zoning ordinance."

In a memorandum accompanying its order denying amended findings or a new trial, the court also stated:

"Proceedings leading to the commencement of this action show that it would have been futile for Plaintiff to make further efforts to seek relief from the Town Board. Under the circumstances the doctrine of exhaustion of administrative remedies does not apply.

"The permits sought by Plaintiff are for the development of single family dwellings on tracts of 2½ acres in a totally rural area. That use is contemplated under existing zoning and is consistent with the intent and purpose of the ordinance. I know of no more desirable type of development.

"Plaintiff established that he was and is willing and able to comply with all ordinance provisions and other reasonable conditions deemed necessary to proceed with this development. Doubtless he experienced some difficulty by reason of the fact that procedures required to obtain permits are virtually nonexistent.

"Noteworthy is the fact that this application was pending before the Town Board for about six months before being denied by way of a moratorium. All facts surrounding this matter compel a conclusion of arbitrary conduct."

60

■ The narrow issue for our determination is whether the following resolution of the town board adopted October 17, 1972, is authorized by law and applies to respondent Almquist or whether, as the trial court held, he had a vested and absolute right to go forward with his proposed development under the zoning ordinance which was in effect at the time the moratorium was adopted:

"WHEREAS it has become apparent to the Town Board of Marshan Township, Dakota County, Minnesota, that a study is needed by said Township to attempt to insure orderly development of said Township and further for the best interests of the health and welfare of the present and future citizens of Marshan Township;

"AND WHEREAS the Town Board of Marshan Township, Dakota County, has requested the Dakota County Planning Department on or about the 26th day of September, 1972, that said Planning Department assist the officials of Marshan Township * * *;

"AND WHEREAS Mr. Gunnar Isberg of the Dakota County Planning office has, on the third day of October, 1972, responded, acting on behalf of the Dakota County Planning office, by advising the officials of Marshan Township that the Dakota County Planning office would assist in the preparation of a Comprehensive Plan for Marshan Township;

"FURTHER, WHEREAS, Gunnar Isberg has recommended that an interim moratorium be placed on all proposed developments in Marshan Township during a six-month period so as to allow a sensible and comprehensive study to be made by the Dakota County Planning office and the officials of Marshan Township in an attempt to arrive at a workable Comprehensive Plan for Marshan Township;

"THEREFORE, be it resolved that from this date until April 17, 1973 all development shall cease in Marshan Township, Dakota County, Minnesota. Further, that the Building Inspector of Marshan Township cease and desist from the issuance of any building permits until April 17, 1973, other than those permits which

may be necessary for repair or alteration of presently existing structures or for building on lands already developed and/or platted."

Respondent cites as authority for holding the moratorium unlawful the following cases among others: Alexander v. City of Minneapolis, 267 Minn. 155, 125 N. W. 2d 583 (1963); Ostrand v. Village of North St. Paul, 275 Minn. 440, 147 N. W. 2d 571 (1966); Hay v. Township of Grow, 296 Minn. 1, 206 N. W. 2d 19 (1973); Main Realty, Inc. v. Pagel, 296 Minn. 362, 208 N. W. 2d 758 (1973); Metro 500, Inc. v. City of Brooklyn Park, 297 Minn. 294, 211 N. W. 2d 358 (1973). Without attempting to distinguish or analyze each case in detail, it is enough to say that if we have suggested that any moratorium for whatever purpose or of whatever duration is invalid, our observations were simply dicta. In Alexander, the so-called hold order on issuing building permits pending adoption of a proposed comprehensive zoning ordinance continued for 9 years, from 1953 to 1962. That case was decided before the enactment of L. 1965, c. 670, now Minn. St. 462.351 to 462.364, relating to municipal planning and development. Section 462.351 contains the following statement of policy:

"The legislature finds that municipalities are faced with mounting problems in providing means of guiding future development of land so as to insure a safer, more pleasant and more economical environment for residential, commercial, industrial and public activities and to promote the public health, safety, morals and general welfare. Municipalities can prepare for anticipated changes and by such preparations bring about significant savings in both private and public expenditures. Municipal planning, by providing public guides to future municipal action, enables other public and private agencies to plan their activities in harmony with the municipality's plans. Municipal planning will assist in developing lands more wisely to serve citizens more effectively, will make the provision of public services less costly,

and will achieve a more secure tax base. It is the purpose of sections 462.351 to 462.364 to provide municipalities, in a single body of law, with the necessary powers and a uniform procedure for adequately conducting and implementing municipal planning."

By the same token, we held in Ostrand that a so-called stopgap or "freeze" ordinance suspending the issuance of special permits for multiple residential purposes for a period of nearly 2 years was invalid. Here again no persuasive reasons were given for the action of the municipality, the duration of the moratorium was unreasonably long, and the case was decided by the trial court before the adoption of L. 1965, c. 670, the so-called Municipal Planning Act.

Hay was decided on equal protection grounds where we found that a special-use permit was denied only because the municipality had granted a permit for a similar purpose and did not wish to duplicate a mobile home park already authorized. No moratorium issue was involved. Nor did the Metro and Main Realty cases deal with the adoption of moratorium ordinances.

Respondent Almquist concedes that there may be circumstances under which a moratorium ordinance is a valuable tool to keep open a municipality's planning options. He argues, however, that where an abrupt change in zoning occurs after an application for a permit has been made under an existing zoning law, and the property owner has met all of the conditions which the municipality imposes without advising him of the contemplated changes in zoning, the result is so unfair and unjust as to invoke the doctrine of estoppel against the municipality in its effort to apply a moratorium. There is merit in this argument, and we recognize the frustrations which respondent experienced in attempting to induce the town board to take action on his proposal. Nevertheless, there is nothing in this record to justify a finding that the board's delay and the adoption of the moratorium constituted arbitrary, capricious, or unreasonable conduct. The evidence quite clearly indicates that

members of the board were laymen with no particular expertise to cope with the complicated problems of urban planning and development. During the period when Almquist was seeking approval of his plan, three other developers were also submitting proposals. Confronted with these alternatives, it was not wholly unreasonable for the board ultimately to resort to a moratorium which would permit them to utilize the expertise of professional planners for a comprehensive zoning system which would affect the growth and quality of the community for an indefinite period in the future. We find the reasons given for the moratorium demonstrate a good-faith effort to accomplish these goals. The moratorium resolution itself recites a need for orderly development and for the assistance of the county planning office in preparing a comprehensive plan to meet the need in a sensible and workable manner.

We are of the opinion that the considerations which prompted adoption of the moratorium were matters of legitimate concern to the town board and justified their action. We are persuaded on this record that the board acted in good faith.

A more difficult question is presented by the failure of the legislature to grant municipalities specific authority to adopt moratorium ordinances. Minn. St. 394.34 authorizes county boards to adopt a temporary interim zoning ordinance under the following conditions:

"If a county is conducting, or in good faith intends to conduct studies within a reasonable time, or has held or is holding a hearing for the purpose of considering a comprehensive plan or official controls or an amendment, extension, or addition to either, or in the event new territory for which no zoning may have been adopted, may be annexed to a municipality, the board in order to protect the public health, safety, and general welfare may adopt as an emergency measure a temporary interim zoning map or temporary interim zoning ordinance, the purpose of which shall be to classify and regulate uses and related matters as constitutes the emergency. Such interim resolution shall be limited

to one year from the date it becomes effective and to one year to renewal thereafter."

Failure to include municipalities, it is argued, reflects a legislative intent to be governed by our dictum in Alexander and Ostrand. However, an equally persuasive argument may be made that the legislature felt bound by our pronouncements or simply assumed that municipalities had inherent power to enact such ordinances. We are of the view, however, that in the absence of explicit expression of a contrary purpose by the legislature, we are free to hold that under general principles conferring on municipalities broad police powers, they have authority to adopt moratorium ordinances of limited duration provided they are enacted in good faith and without discrimination. The statement of policy contained in the Municipal Planning Act, § 462.351, supports this conclusion. That statute recites, among other things:

"* * * It is the purpose of sections 462.351 to 462.364 to provide municipalities, in a single body of law, with the necessary powers and a uniform procedure for adequately conducting and implementing municipal planning."

Here, as we have indicated, in a relatively small community, a town board was confronted with four developers proposing plans which would have a profound effect on economic, esthetic, and engineering problems for many years to come. In recognition of these realities, the National Commission on Urban Problems has noted:

"The prevention of urban sprawl should therefore qualify as a valid public purpose justifying the use of valid zoning and timing regulations. * * * The Commission recommends that * * * local governments establish holding zones in order to postpone urban development in areas that are inappropriate for development * * *." *Alternatives to Urban Sprawl* (Research Rep. No. 15, 1968), p. 45.

Equally persuasive reasons for permitting moratorium ordinances are to prevent nonconforming uses which might destroy the comprehensive zoning plan ultimately adopted, as well as to derive the benefits of permitting a democratic discussion and participation by citizens and developers in drafting long-range land use plans.

In summary, we are of the opinion that the resolution adopted by Marshan on October 17 was not a moratorium of indefinite duration which we have previously condemned. It was more in the nature of a stay of proceedings, holding development in a state of suspense to permit the town to keep its planning options open and to conduct a study of long-range development. While not specifically authorized by statute, authority for such procedure seems implicit in Minn. St. 462.351. We hold that where a municipality enacts in good faith and without discrimination, a moratorium on development which is of limited duration, is valid if, upon enactment, the study proceeds promptly and appropriate zoning ordinances are expeditiously adopted when it is completed.

In upholding the validity of the moratorium ordinance, we find support in a number of precedents elsewhere. The rule followed in most jurisdictions permits the retroactive application of a zoning regulation to deny a building permit for which application was made prior to the effective date of the new ordinance. In applying the rule, however, consideration is given to whether or not the landowner has substantially changed his position in reliance on the existing ordinance and to whether or not the municipality has acted in good faith or has discriminated against a particular property owner.[3] A very recent Massachusetts case

---

[3] See, Annotations, 50 A. L. R. 3d 596, 602, 603, 607, and 30 A. L. R. 3d 1196, 1221. See, also, Freilich & Ragsdale, *Timing and Sequential Controls—The Essential Basis for Effective Regional Planning: An Analysis of the New Directions for Land Use Control in the Minneapolis-St. Paul Metropolitan Region,* 58 Minn. L. Rev. 1009, 1048; Mang v. County of Santa Barbara, 182 Cal. App. 2d 93, 5 Cal. Rptr. 724 (1960); Monmouth

dealing extensively with the subject has upheld a 2-year moratorium ordinance. Collura v. Town of Arlington, 329 N. E. 2d 733 (Mass. 1975). There, a property owner applied in November 1972 for a permit to construct an apartment building on land zoned for that purpose. In December 1972, hearings were held on a proposed ordinance to suspend construction of apartments. Although a permit was issued to the plaintiff in January 1973, it was accompanied by a caveat that the moratorium amendment was being considered. In March 1973, the moratorium was adopted by the town board. Subsequently, the trial court held that the permit was not affected by the moratorium, and the Supreme Court of Massachusetts reversed. The latter court held that although there was no express statutory authority for the town to adopt a moratorium, it could be implied from the broad language of the statute delegating zoning authority to cities and towns. Holding that those powers were not to be narrowly interpreted, the court adopted as a test "whether there is any substantial relation between the amendment and the furtherance of any of the general objects of the enabling act." 329 N. E. 2d 736. The court went on to point out that the weight of authority holds that "reasonable interim zoning provisions may be enacted within the scope of a general zoning enabling act, without reliance on specific statutory authorization for interim ordinances," citing cases to support that view. 329 N. E. 2d 737. The court went on to say:

"* * * Interim zoning can be considered a salutary device in the process of plotting a comprehensive zoning plan to be employed to prevent disruption of the ultimate plan itself. * * * The orderly process of interim zoning allows the issues to have the

---

Lbr. Co. v. Ocean Township, 9 N. J. 64, 87 A. 2d 9 (1952); Town of Lebanon v. Woods, 153 Conn. 182, 215 A. 2d 112 (1965); Gayland v. Salt Lake County, 11 Utah 2d 307, 358 P. 2d 633 (1961); 1 Rathkopf, The Law of Zoning and Planning (4 ed.) §§ 8.01 to 8.07.

benefit of full public debate, at the same time protecting the affected area from unwise exploitation prior to agreement and formulation of new zoning restrictions which may be more restrictive." 329 N. E. 2d 737.

The court concluded by holding that a 2-year moratorium to study a comprehensive plan which was already underway was not unreasonable. As early as 1925, the California Supreme Court in Miller v. Board of Public Works, 195 Cal. 477, 496, 234 P. 381, 388, held a moratorium on building permits to be valid, assigning the following reasons:

"It is a matter of common knowledge that a zoning plan of the extent contemplated in the instant case cannot be made in a day. Therefore, we may take judicial notice of the fact that it will take much time to work out the details of such a plan and that obviously it would be destructive of the plan if, during the period of its incubation, parties seeking to evade the operation thereof should be permitted to enter upon a course of construction which might progress so far as to defeat in whole or in part the ultimate execution of the plan."

The court found the moratorium to be a proper exercise of municipal police power. The Federal court in Downham v. City Council of Alexandria, 58 F. 2d 784, 788 (E. D. Va. 1932), reached a similar result, observing that to hold otherwise would render ineffective zoning ordinances later adopted, "like locking the stable after the horse is stolen." In Campana v. Township of Clark, 82 N. J. Super. 392, 397, 197 A. 2d 711, 714 (1964), 31 months was held not to be an unreasonable moratorium. The court stressed the fact that the township had proceeded in good faith, and held that the mere passage of time was not the only factor in determining whether a stopgap ordinance was reasonable.

"* * * We must also look to the progress of the study being made, its nearness to completion, and the prospects for passage of a new zoning ordinance, keeping in mind at the same time that

such a comprehensive zoning plan requires considerable time for preparation and study."

The ordinance was upheld as a reasonable exercise of police power. In sustaining a similar ordinance, the California Supreme Court in Russian Hill Improvement Assn. v. Board of Permit Appeals, 66 Cal. 2d 34, 44, 45, 56 Cal. Rptr. 672, 680, 681, 423 P. 2d 824, 832, 833 (1967), emphasized the objectives of zoning to eliminate nonconforming uses, deterring "last-minute efforts to race through the gamut of permit procedures," and "discouraging the exploitation of the delays inherent in the municipal legislative process." To the same effect is Chicago Title & Trust Co. v. Village of Palatine, 22 Ill. App. 2d 264, 160 N. E. 2d 697 (1959), where the court, citing a number of decisions from other jurisdictions, found the general rule to be that the issuance of building permits may be validly delayed where the municipality has under consideration an ordinance which, if adopted, would prohibit the use contemplated by the permit.

■ The effect of the moratorium adopted by the town board of Marshan on October 17, 1972, and its subsequent enactment of the zoning ordinance which became effective June 19, 1973, was to change the use of respondent Almquist's 82½ acres from P-O-C zoning, allowing 2½-acre lots for nonfarm dwellings with a special-use permit, to zoning for agricultural preservation for the following purposes and uses, allowing one-family dwellings on 10 acres of farmable land or on 5 acres of nonfarmable land:

"PURPOSE

"Agricultural Preservation areas are established in rural areas for the purpose of: protecting viable agricultural lands from non-farm influence; retaining valuable areas for conservational purposes; preventing scattered non-farm growth; preserving a secure economy in governmental expenditures for public services, utilities and schools and deterring abuse of water and other natural resources of the community.

"Permitted Uses

"Agricultural Land Uses.

"Farmstead Residences.

"Forestry and Nurseries.

"Seasonal Produce Stands.

"Telephone, Telegraph, and Power Transmission Lines and Necessary Appurtenant Structures.

"Public Recreation."

The issue to be tried by the trial court is not whether the zoning ordinance of June 19, 1973, rendered respondent's land less valuable. It is too fundamental for citation of authorities that rezoning, which is otherwise valid, does not give rise to an action for damages because the land in question may be more valuable for some other purpose. This rule, of course, is subject to the right of the landowner to continue a nonconforming use, but that problem is not here present. The issue to be litigated upon remand is whether, in reliance on the P-O-C zoning which was in effect at the time respondent applied for a special-use permit on October 17, 1972, he took steps to develop his property in a manner consistent with the existing zoning which resulted in detriment so substantial that it would be unjust to deny him the building permit which he sought before the moratorium was adopted. As we have indicated, this issue was not litigated. However, we reiterate that under the rules we adopted in Hawkinson v. County of Itasca, 304 Minn. 367, 231 N. W. 2d 279 (1975), dealing with a closely related zoning problem, the record before us does not support a finding of substantial prejudice sufficient to permit respondent to have the benefit of a special-use permit.

In Hawkinson, the question was whether the property owner had progressed in developing a commercial recreational summer resort to a point requiring a finding that he was entitled to complete his projected plans as a nonconforming use under a new ordinance which zoned the property residential. There, the owner had spent some $80,000 in improving his land for commercial

purposes in a project which was intended to cost some $275,000. We held the following rule to be applicable (304 Minn. 373, 377, 231 N. W. 2d 282, 284):

"Under what circumstances a property owner may complete a project which is in progress at the time his use of the property becomes nonconforming is a difficult question. Its resolution is ordinarily governed by the degree of hardship which would be imposed if construction or expansion were halted before completion.

\* \* \* \* \*

"\* \* \* For plaintiff to prevail, it is not enough that he show *some* prejudice in not being permitted to carry out his plans. There must be *substantial* prejudice. \* \* \*

"\* \* \* In our opinion, the expenses plaintiff incurred by way of preparation did not result in prejudice so substantial as to permit him to complete the project."

Applying that rule to the facts of this case, clearly the $3,000 which respondent spent in having the property surveyed does not constitute sufficient detriment to justify his completing his plans for developing the 82½ acres under P-O-C zoning. Neither does the value of his own services require such a result. In Hawkinson, the landowner valued his family's personal services in developing his property at $20,000. The delays, disappointment, and frustration which Almquist has experienced are not enough to justify the issuance of the building permit he sought, however regrettable they may be. He is not entitled to the relief he seeks merely as a reward for his patience or as punishment for the town's dilatory procedures. In order to obtain a judicial determination that he is entitled to develop his property under P-O-C zoning, he must show that the delay has caused him material damage in the use and exploitation of his land. The determination to be made by the trial court is a balancing of important policy considerations which are the legitimate goals of the municipality against any undue, or unnecessary and substantial hard-

ship which may have been inflicted on respondent by the town's delay. However, we do not intimate any opinion as to how this issue should be resolved on a retrial.

Reversed and remanded.

## Appendix

"MARSHAN TOWNSHIP
COMMUNITY DEVELOPMENT PLAN
Adopted June 19, 1973
"DEVELOPMENT PROBLEMS AND CONCEPTS

*     *     *     *     *

"The problems facing any developing community [such as Marshan, which was entirely an agricultural township until the current suburban growth trend] . . . involve provision of adequate services such as sewer and water, acquisition of parks, construction of roads and schools at a time when the tax base is often low. The problems are not insurmountable nor always that complex; nor should it be assumed that a community development plan will allow a township to hurdle these problems in measured stride. What a community plan should do is two things: it should result in a desirable development pattern and environment and it should save the taxpayer's money (Preface).

"1.  INTRODUCTION

*     *     *     *     *

"The Marshan Town Board and Planning Commission, recognizing they are receiving many development pressures and problems, formally requested on September 19, 1972 that the Dakota County Planning Department assist them in formulating a Community Development Plan for their township.

"This resulting plan was drafted with the technical assistance of the Dakota County Planning Department, but adopted only after many meetings, discussions and revisions by the Marshan Town Officials so as to provide an agreeable, workable plan with which Marshan could guide the orderly, healthy development of their township. Thus, the policies and program for future de-

velopment of the township were developed by members of the Town Board and Planning Commission.

"PURPOSE

"The purpose of this Community Development Plan is to develop goals, policies and programs to guide the future development of the township in a manner consistent with wise economic and planning philosophies. Special attention is given to the consequences of premature and leap-frog development to the future of Marshan Township. In addition, natural resource information (soils, topography, steep slopes, etc.) play a dominant role as a basis for the policies and program for future development. Another prime concern was over the preservation of agricultural land in order to make it possible for the farmers to continue farming if they wished to do so.

"Thus, the policies and ordinances that follow are meant to guide development to protect the natural resources and agricultural land and to promote orderly expansion of development. Hopefully, in this way, a desirable environment can be created for the existing and future citizens of Marshan Township. The policies and ordinances that follow are meant to prevent growth that may be harmful to the health and economic well being of the township.

"Considerations were also given to the whole range of urban services that would be required by uncontrolled, unguided development and the high cost of these services to the taxpayers. These include police and fire protection, road maintenance, snow plowing, sewer, water and governmental services.

"It should be emphasized that Marshan will be implementing policies designed to control and guide, *but not to prevent* urban growth.

\* \* \* \* \*

"III.  RESIDENTIAL DEVELOPMENT

"There are a number of present and potential problems facing Marshan Township.

\* \* \* \* \*

"The number of non-farm residential houses in areas which will not be sewered pose potential ground water pollution problems.

\* \* \* \* \*

"Premature residential development in agricultural areas result in higher tax rates for agricultural land and permanently preempts valued farmland for urban uses.

\* \* \* \* \*

"VI. AGRICULTURE

"Agricultural production is a necessary field of endeavor for the survival of man. Marshan's primary land use at this time is agricultural. The Town Board and citizens feel this should be preserved for reasons listed below:

"1. In a heavily populated area, such as the metropolitan area is at the present time, it appears essential that some lands be maintained as open lands for the general good and the welfare of the entire citizenry of the metropolitan area.

"2. There are several communities in the metropolitan area able to provide residents with the varied municipal services required for the general health, safety and welfare. Marshan Township cannot presently economically provide these services throughout the township. Therefore, residential development should be encouraged in their respective zones and discouraged on the farm lands which are unable to cope with the problems created by development.

"3. With population expanding, there can be no doubt that farm production should have a high national priority. With food prices inflating, it is economically sensible to encourage agriculture on land best suited to production. It is therefore essential to protect those areas that are suitable for agricultural production in Marshan Township. It is recognized that all cannot be farmed. Therefore, strict control will only be in effect for farmable areas. Wooded and other non-farmable areas will be allowed to develop with non-farm residential uses.

"In our society, it is essential that areas be designed for in-

dustrial use, commercial use, housing developments, recreational areas, and farming operations. This network is necessary to keep our society intact. It is only logical that each of the above be placed in an area that is best able to service that particular classification. Thus, the southerly portion of Marshan Township, as outlined in A-1 on the Zoning Map appears to be the most logical place for the farming and food growing operation of our society (p. 5).

"It is recommended that two agricultural districts be established.

"The first zone will be an agricultural holding zone.

\* \* \* \* \*

"The second zone will be an agricultural preservation zone. This zone is established to preserve lands for production of food and fiber products. Such a zone has as much justification as does residential, commercial and industrial zones. Housing starts in this zone shall be confined to a minimum of ten acre parcels, except in non-farmable areas. Non-farmable areas will have a five acre minimum lot size and lots must be platted after the sale of the first five acre lot. First lot may be conveyed by registered land survey.

"POLICIES

"1. Encourage agriculture in the southern portion of Marshan Township.

"2. Promote the use of Green Acres Law to preserve the farming operations in the township.

"3. Non-farm residential construction in agricultural protection districts shall be on a minimum lot size of 10 acres in farmable areas.

"4. Agriculture shall be encouraged to remain as the major land use in Marshan Township for some time to come.

"5. The County and State tax assessors will be notified of this zoning in order to depress rising tax assessments.

"6. Conveyance of parcels under 10 acres must be by a registered land survey or through regular platting procedures.

"7. Non-farm residential construction in non-farmable areas of the Agricultural Protection District must be on a minimum of five acres and lots must be platted with the exception of the first sale on a farm parcel. The first sale may be a registered land survey."

KELLY, JUSTICE (dissenting).

I respectfully dissent. There is ample evidence on the record to support the trial court's conclusion that the 8-month zoning moratorium[1] was arbitrarily and capriciously directed at Earle Almquist's property. Because of this posture of the evidence, I would affirm, or, at the very least, allow Almquist to challenge the arbitrary nature of the moratorium on remand without dooming him to failure under a "substantial prejudice" standard.

The majority opinion finds some difficulty with this case because "neither the authority which Almquist sought to obtain from Marshan nor the issues litigated in the trial court are clearly defined." While initially there might have been some confusion as to what Almquist was seeking, the town board knew almost from the beginning that he was seeking a special-use permit. This is shown by the town's brief:

"Confronted here by the necessity of Town Board approval, Almquist first appeared before the Planning Commission on March 7, 1972 with a very rough sketch of his proposed development * * *. From the outset, there was some confusion as to precisely what Almquist was seeking. * * * This confusion stemmed primarily from Almquist's failure to couch his requests in specific terms of special use permit, building permits, or plat approval. Nevertheless, the Town Board correctly recognizing that this application was governed by special permit provisions of the zoning ordinance and not by its subdivision regulations,

---

[1] The town board initially passed a 6-month moratorium and then extended it 1 month. The new ordinance was passed 1 month later, so in effect the moratorium was 8 months in duration.

referred Almquist to the Planning Commission for a recommendation on the appropriateness of Almquist's application before rendering a decision on the special permits * * *. After some preliminary discussions of the development with both the Planning Commission and the Town Board, the matter was referred to the Town's newly acquired consulting engineer, Mr. Donald Overland of the Milner W. Carley engineering firm * * * for study and recommendation."

There is no evidence that the town board at any time refused to grant approval of Almquist's application because it did not know what he was seeking. Initially, he had asked for approval of a development project under a project plan showing lots and roads. At the request of the town board and its consultants, he showed the drainage, the topography, etc. on his project plan. When he asked for approval of his project, he was told that he had to have a plan acceptable to the town board. It was abundantly clear to both Almquist and the town board that Almquist was seeking at all times the necessary approval to proceed with his residential development project. If this were not clear, why did both parties, through meetings and consultants, work on the project for over 6 months? It is ridiculous for the town board to argue now that Almquist asked only for approval of his plan for development and that he should be denied any approval because he did not use the magic words, "special-use permit."

While the issues at the time of trial may not have been well defined, they were adequately defined. Our liberal rules of pleading do not usually lead to well-defined issues and this case was no exception. The factual issues that were decided, however, are quite clear. The essential ones are set forth in the findings as follows:

"At the Town Board meeting of September 19, 1972, Plaintiff was advised that action on his application would be taken at their October 1972 meeting. No further conditions or changes in the plan were requested or fixed at that time.

"At the October 17, 1972 meeting the Town Board denied Plaintiff's application for a special use permit by passing a resolution declaring a moratorium on all development within the Township for a period of six (6) months.

"That the action of the Town Board with respect to this application was arbitrary, capricious and unreasonable.

"The evidence before the Court establishes that Plaintiff's requested use is compatible with the basic use authorized within a P-O-C zone, is in complete harmony with the intent and purpose of the zoning ordinance and in no manner endangers the public health, safety or general welfare of the Town of Marshan or any resident of that community."

The majority opinion reversed, at least in part, on the ground that the court below based its decision on the erroneous theory that a municipality does not have the power to impose a moratorium of limited duration. I agree that if that court's decision was so based, and the town was thereby prejudiced, it should be reversed. However, I conclude that the court based its decision on the ground that the moratorium was arbitrary as applied to Almquist and that its remarks concerning the erroneous theory were gratuitous and not prejudicial to the town. The trial court made a number of findings, all of which would be superfluous if the court intended that the moratorium was per se invalid. They read as follows:

"Almost every month thereafter meetings were had with the planning commission, the Town Board or correspondence passed between the parties resulting in various changes and alterations in Plaintiff's proposed development plan.

"At all times Plaintiff was willing and able to comply and has complied with all change recommendations and conditions fixed by the Planning Commission or the Town Board with respect to his proposed development."

Those findings were an important part of the basis for the

court's subsequent finding that the "action of the Town Board with respect to this application was arbitrary, capricious and unreasonable."

The conclusion that the trial court based its decision on the arbitrary and capricious action of the town board in delaying any decision on Almquist's action for 6 months and then extending that by a moratorium for a further 8 months is fortified by that court's memorandum accompanying its order denying a new trial:

"Proceedings leading to the commencement of this action show that it would have been futile for Plaintiff to make further efforts to seek relief from the Town Board. Under the circumstances the doctrine of exhaustion of administrative remedies does not apply.

"The permits sought by Plaintiff are for the development of single family dwellings on tracts of 2½ acres in a totally rural area. That use is contemplated under existing zoning and is consistent with the intent and purpose of the ordinance. I know of no more desirable type of development.

"Plaintiff established that he was and is willing and able to comply with all ordinance provisions and other reasonable conditions deemed necessary to proceed with this development. Doubtless he experienced some difficulty by reason of the fact that procedures required to obtain permits are virtually nonexistent.

"Noteworthy is the fact that this application was pending before the Town Board for about six months before being denied by way of a moratorium. All facts surrounding this matter compel a conclusion of arbitrary conduct."

I recognize that the trial court's memorandum accompanying its earlier order for judgment, standing alone and at first blush, might lead one to believe that he was mistaken as to the law to be applied. It reads as follows:

"Unlike the situation where an application is made for a vari-

ance or change in zoning Plaintiff in this case seeks to obtain a permit to use his land for a purpose expressly permitted by the zoning ordinance.

"Nothing in the record reasonably tends to show that the construction and maintenance of the proposed subdivision is liable to work any injury, inconvenience or annoyance to the community or any person.

"Accordingly, the Court must recognize the absolute right of an individual to rely upon zoning in effect at the time he makes application for a use contemplated under a zoning ordinance."

I do not construe this language as the majority does. First, the word "accordingly" prefacing the last paragraph refers back to the record in this case, and, second, the memo accompanies an order which determined that the action of the town board was arbitrary in adopting a moratorium, but limited that finding to its effect on Almquist's application. In addition, the court did not at any time find or indicate the moratorium was per se invalid. Finally, the memorandum of the trial court accompanying the order denying amended findings or new trial further clarifies the basis of the initial decision: "Noteworthy is the fact that this application was pending before the Town Board for about six months before being denied by way of moratorium. *All facts surrounding this matter compel a conclusion of arbitrary conduct.*" (Italics supplied.)

Based on the above discussion, I see the dispositive issue in the instant case in a somewhat different posture than the majority. I would frame the issue as follows: Was the trial court's finding that the actions of the town board in declaring and applying to the property of Earle Almquist a moratorium of a total of 8 months' duration clearly erroneous?

The record amply supports the finding of the trial court that the town's refusal to grant Almquist a special-use permit was arbitrary, capricious, and unreasonable. Between March and

October of 1972, Almquist appeared before the town planning commission three times and the town board three times seeking permission to proceed with his development. He and his consultant worked on his project with Donald G. Overland, a professional engineer serving as consultant on land development to Marshan Township, from July to September 1972. It is undisputed that immediately prior to the town board meeting of October 17, 1972, Almquist had surmounted all of the obstacles to his project the town had placed in front of him. In a letter to the planning commission on September 5, 1972, Overland had described Almquist's plat as "well prepared" and nowhere in these proceedings has the town presented any evidence that Almquist had not painstakingly met every reasonable requirement for obtaining the special-use permit he formally requested at the town board meeting on October 17, 1972. At that meeting, however, he received an unpleasant surprise from the town board, which had theretofore incrementally approved and advanced his proposal. Before considering his request, the board passed a 6-month moratorium on building permits, [2] and then denied his request because of that moratorium. It should be noted that the moratorium expired on April 19, 1973, and that the town board advised Almquist it would render a decision within 6 months. That period had expired by the time of trial and at the time of the decision in the court below. [3] At the trial, board member Robert Weber gave no specific reasons for the moratorium, although he did note, as the majority points out, that three other requests were being considered at the same time. The minutes of the meeting reveal that *two* other requests besides Almquist's were denied because of the moratorium. Neither those minutes nor the trial transcript supply any specific reason why Almquist or anyone

---

[2] The terms building permit and special-use permit are used synonymously in the ordinances involved herein.

[3] The original 6-month moratorium was extended for 2 months. A new comprehensive ordinance rezoning Almquist's property was passed on June 19, 1973.

else should not be allowed to build single-family houses on 2½ acre lots other than the board's dramatically sudden decision that a moratorium was necessary to allow a "sensible and comprehensive study" leading to a comprehensive land use plan for the township. *No substantial facts or policy considerations underlying that decision were presented at the trial.* On this record, the trial court could reasonably have concluded that the moratorium was pure artifice—a device calculated to deny Almquist's proposal with only a window dressing of public interest.

While I agree that a moratorium for a reasonable period of time might be a permissible exercise of a municipality's zoning power, such a moratorium should be carefully scrutinized where arbitrariness and capriciousness may be present. Neither our prior decisions, fairly read, nor the bulk of well-reasoned foreign decisions support the moratorium in this case. Although the "hold order" which the city imposed in Alexander v. City of Minneapolis, 267 Minn. 155, 125 N. W. 2d 583 (1963) was longer than the moratorium here, we quoted as an additional basis for our decision the following language from State ex rel. The Fairmount Center Co. v. Arnold, 138 Ohio St. 259, 34 N. E. 2d 777, 136 A. L. R. 840 (1941) :

"A municipal council may not, by the enactment of an emergency ordinance, give retroactive effect to a pending zoning ordinance thus depriving a property owner of his right to a building permit in accordance with a zoning ordinance in effect at the time of the application for such permit." 267 Minn. 159, 125 N. W. 2d 586.

Thus, in Alexander, we recognized at least some limited right in a landowner to rely on existing zoning ordinances. In Ostrand v. Village of North St. Paul, 275 Minn. 440, 147 N. W. 2d 571 (1966), we concluded that an ordinance intended to act as a "stopgap" until a new comprehensive zoning ordinance could be enacted was irrelevant to an application for a construction per-

mit made before the adoption of the new comprehensive ordinance. While we noted that the "stopgap" ordinance there lasted for nearly two years, we based our holding on the ground that "stopgap" ordinances deny due process:

"The language of Ordinance No. 320, upon which the council determined that existing zoning ordinances could be ignored until action was taken upon the contemplated general comprehensive zoning, is indefinite. We are inclined to agree with the trial court's concept of it as a 'stopgap' ordinance, although its language makes any conclusion as to its meaning extremely uncertain. It was adopted August 15, 1960, almost 2 years before the new zoning ordinance was adopted. As the trial court stated, '[I]t appears to be an effort to freeze all zoning as of a certain date unless the council decides otherwise.' *We have held that an ordinance of this kind constitutes taking of property without due process* contrary to constitutional requirements. In such light it must be held irrelevant in the present proceedings. See, Alexander v. City of Minneapolis, 267 Minn. 155, 125 N. W. (2d) 583." (Italics supplied.) 275 Minn. 448, 147 N. W. 2d 576.

Since we expressly premised the above decisions on constitutional grounds, any reliance by the majority on the vaguely worded legislative policy to promote traditional objectives of "public health, safety, morals and general welfare" found in L. 1965, c. 670, is misplaced.

But one need not go even as far as we have gone in the above decisions to affirm in this case. While the majority is correct in its statement of the general rule allowing retroactive application of zoning ordinances, Annotation, 50 A. L. R. 3d 596, 602, the instant case falls within a major exception to that rule refusing to allow retroactive application in cases of bad faith or arbitrary action on the part of a governmental subdivision. 50 A. L. R. 3d 603. Several courts have indicated in this vein that an ordinance enacted as special legislation in an attempt to frustrate a developer's plans to lawfully use his property will not be enforced

against such a developer. Commercial Properties, Inc. v. Peternel, 418 Pa. 304, 211 A. 2d 514 (1965); Linda Development Corp. v. Plymouth Township, 3 Pa. Cmwlth. 334, 281 A. 2d 784 (1971); Nott v. Wolff, 18 Ill. 2d 362, 163 N. E. 2d 809 (1960); Vine v. Zabriskie, 122 N. J. L. 4, 3 A. 2d 886 (1939). See, also, State ex rel. Humble Oil & Refining Co. v. Wahner, 25 Wis. 2d 1, 130 N. W. 2d 304 (1964), and Willingham v. City of Dearborn, 359 Mich. 7, 101 N. W. 2d 294 (1960) (ordinances enacted pendente lite).

In the face of this record and this authority, the majority maintains that the moratorium was a good-faith action by laymen without expertise to permit a laudable objective: comprehensive zoning. First, there is no evidence that the town board members lacked expertise in zoning matters. In fact, the only evidence we have on that issue indicates that one board member had seven years' experience on the planning commission and has assisted in developing the pre-moratorium ordinance at issue in this case. In addition, the board has the services and advice of a professional on land development in the person of its engineer; Overland, whose suggestions were followed by Almquist. Second, there is no evidence that an 8-month moratorium followed by a comprehensive zoning ordinance was necessary in the Town of Marshan in this case. There is no evidence of any threat posed by the Almquist proposal or any other proposal to the health, safety, or welfare of the people of Marshan that would justify a moratorium and comprehensive zoning. In the absence of such evidence, the trial court could have concluded, as it did, that the moratorium was directed at Almquist's property and constituted arbitrary action.

In the past, this court has been particularly sensitive in balancing the important governmental interests in flexible and comprehensive land use planning and the oft-times forgotten interests of the individual citizen in freedom from government interference in the use of his property and in fair and civil treat-

ment by government officials. Metro 500, Inc. v. City of Brooklyn Park, 297 Minn. 294, 211 N. W. 2d 358 (1973) ; Main Realty, Inc. v. Pagel, 296 Minn. 362, 208 N. W. 2d 758 (1973) ; Hay v. Township of Grow, 296 Minn. 1, 206 N. W. 2d 19 (1973) ; Zylka v. City of Crystal, 283 Minn. 192, 167 N. W. 2d 45 (1969). There is unquestionable merit in the majority's argument that a moratorium of reasonable duration ought to be a weapon in local government's arsenal as it faces land use problems. But such a moratorium should not apply to Earle Almquist on the facts of this case. After many months of planning and diligent compliance with town requirements, Almquist was confronted with a new ordinance and the task of starting all over. The town should not have been allowed to deny his request without good and sufficient reason and then to take refuge behind a shield of "greater public good." Whether the legal theory is labeled estoppel, arbitrary action, denial of due process, or a taking without compensation, there should be some remedy for the wrong he has suffered. Minn. Const. art. 1, § 8.[4]

A further issue suggested by the facts in this case is the validity of Marshan's new comprehensive zoning ordinance. As I read the majority opinion, it does not foreclose a direct attack upon the ordinance by Almquist or anyone else affected by it. I have grave doubts that the ordinance could withstand such an attack. Under the ordinance, Almquist's land is zoned for "agricultural preservation," allowing single-family dwellings on 10 acres of farmable land or on 5 acres of nonfarmable land. This size requirement is unbelievable when it is contrasted with engineer Overland's statement to the planning board that the lots of 2½ acres called for by Almquist's plan were large and should perhaps be broken down into smaller parcels. First, Almquist's uncontradicted testimony in the case at bar establishes that his land is unfit for farming because the soil is sandy and would

---

[4] Therefore, even if the majority is correct in its view that the trial court proceeded on an erroneous theory of law, Almquist should at least receive a new trial on the issue of arbitrariness.

yield an average of only 5 bushels of soybeans per acre. The town's attempt to zone his land for agricultural use thus may well be confiscatory and invalid. County of Freeborn v. Claussen, 295 Minn. 96, 102, 203 N. W. 2d 323, 327 (1972) ; State ex rel. Howard v. Village of Roseville, 244 Minn. 343, 70 N. W. 2d 404 (1955) ; 1 Rathkopf, The Law of Zoning and Planning (14 ed.) § 6.03.

Second, the imposition of 10-acre-minimum lot sizes for single-family homes seems an unreasonable means to achieve the purported objective of agricultural preservation. It is difficult to imagine a profitable farm in the area in question no larger than 10 acres. And yet, the ordinance permits a single-family house on 10 acres of land. This suggests to me that the ordinance is not tailored to preserve agriculture, but to allow only *large* country estates.

Finally, the ordinance is exclusionary[5] in that it tends to keep poor and middle-income citizens who might like to live in the Marshan countryside from doing so because of the potentially prohibitive price of a 10-acre lot. In this way the town is able to exclude all but the rich and to hamper necessary residential development as well. The effect of this goes far beyond the town itself and tends to promote overcrowding in our metropolitan areas. The majority speaks in derogatory terms of urban sprawl. I suggest that urban overcrowding is likewise a serious problem. However, freedom of choice for our people is most important. In a recent extensive and well-reasoned opinion, the Supreme Court of New Jersey has so held, striking down, among other provisions, a restrictive minimum-lot-size requirement.[6] South-

---

[5] Exclusionary zoning has produced much scholarly writing. Among the better articles are: Note, 84 Harv. L. Rev. 1645; Note, 81 Yale L. J. 61; Note, 69 Mich. L. Rev. 339; Symposium, 22 Syracuse L. Rev. 465.

[6] See, generally, on minimum lot sizes: Appeal of Kit-Mar Builders, Inc. 439 Pa. 466, 268 A. 2d 765 (1970); National Land & Investment Co. v. Kohn, 419 Pa. 504, 215 A. 2d 597 (1965).

ern Burlington County N.A.A.C.P. v. Township of Mt. Laurel, 67 N. J. 151, 336 A. 2d 713 (1975). As Justice Hall wrote for the majority:

"It is plain beyond dispute that proper provision for adequate housing of all categories of people is certainly an absolute essential in promotion of the general welfare required in all local land use regulation. Further the universal and constant need for such housing is so important and of broad public interest that the general welfare which developing municipalities like Mount Laurel must consider extends beyond their boundaries and cannot be parochially confined to the claimed good of the particular municipality. It has to follow that, broadly speaking, the presumptive obligation arises for each such municipality affirmatively to plan and provide, by its land use regulations, the reasonable opportunity for an appropriate variety and choice of housing, including, of course, low and moderate cost housing, to meet the needs, desires and resources of all categories of people who may desire to live within its boundaries. Negatively, it may not adopt regulations or policies which thwart or preclude that opportunity." 67 N. J. 179, 336 A. 2d 727.

The Marshan ordinance does not reflect any sense of responsibility for securing the "good life in Minnesota" to our low- and middle-income citizens, many of whom might want to and could afford to purchase a 2½-acre lot from Almquist.

As to the disposition of the instant case, I would hold only that the Marshan moratorium is arbitrary as applied to Earle Almquist. I would do so to preserve some limited freedom of action and fairness of treatment for individual citizens in the face of local irrationality in land use decisions.

TODD, JUSTICE (dissenting).

I join in the dissent of Mr. Justice Kelly.

YETKA, JUSTICE (dissenting).

I join in the dissent of Mr. Justice Kelly.

MR. JUSTICE BREUNIG took no part in the consideration or decision of this case.