Mark SCHENCK, et al., Plaintiffs,

v.

CITY OF HUDSON VILLAGE, et al., Defendants.

No. 5:96–CV–1481.

United States District Court, N.D. Ohio, Eastern Division.

Aug. 1, 1996.

Mark A. Ferguson, Taft, Stettinius & Hollister, Columbus, OH, Nicholas T. George, Law Offices of Nicholas T. George & Associates, Akron, OH, John W. Solomon, Jay P. Porter, Brouse & McDowell, Akron, OH, Timothy J. Grendell, Taft, Stettinius & Hollister, Cleveland, OH, for Mark Schenck, Hudson Land Co., Ltd., L & V Equipment Rental, Inc., Hudson Builders, Inc., James Dagley, Elizabeth Dagley, Kevin Custer, Sharon Custer, Virginia Dinovi, Home Builders Association of Greater Akron.

Amie L. Bruggeman, Charles E. Zumkehr, Breaden M. Douthett, Roetzel & Andress, Akron, OH, for City of Hudson, James Smith, Timothy J. Murphy, David D. Bashore, Jane Waterson, Barbara Berlin, John Krum, Dave McNiff, Rebecca Reagan, Harold Bayless, Betty Montgomery.

*MEMORANDUM OPINION*

DOWD, District Judge.

## I.  INTRODUCTION

Plaintiffs challenge the constitutionality of a zoning ordinance enacted by the City of Hudson Village ("the City"), arguing primarily that the ordinance violates the substantive due process rights of certain developers and real property owners. The ordinance, which became effective May 1, 1996, places a limit on the amount of zoning certificates the City will issue annually. Plaintiffs have filed a motion for a preliminary injunction, asking the Court to order the City not to enforce the ordinance against developers of lots which have already received preliminary or final plat approval. The Court conducted a two-day hearing July 23 and 24, 1996, and has considered the voluminous record submitted by the parties. Upon careful consideration, the Court grants the motion for a preliminary injunction to the extent outlined below.

## II.  FACTUAL BACKGROUND

The current City of Hudson Village is a product of a 1994 merger between the former City of Hudson Village and Hudson Township. The merger increased both the physical size and the population of the City. According to the City's Comprehensive Plan published in August 1995, the 1990 population of the pre-merger City was 5,159 and the population of the township was 11,969 for a combined total of 17,128. Thus the City more than tripled in population as a consequence of the merger. The current estimated population of the City is approximately 21,000. The City covered six square miles prior to 1994. As a result of the merger, it now covers 25 square miles.[1]

The City lies in the northernmost part of Summit County, adjacent to Cuyahoga County, and can best be described as a upscale bedroom community for residents who work in the Akron and Cleveland metropolitan areas. The average cost of a newly constructed home is $320,000, according to the deposition testimony of the City's assistant director of community development. The post-merger City has a distinct rural flavor with rolling topography and little evidence of dependence on an agricultural base.

The City retains a village-like character because the population is spread throughout the 25 square miles. There is no commercial center of any size that would characterize a city of more than 20,000 people if the city were far removed from other urban areas.[2]

Prior to the merger both the City and the township were growing at a rapid rate. The population of the two then-distinct entities grew more than 50 percent in the 1970s and more than 35 percent in the 1980s. With the merger, the new City commissioned a consulting firm to prepare a comprehensive plan to provide an infrastructure to accommodate the needs of the existing population and to prepare for anticipated growth given the continuing movement away from the urban cen-

---

1. The former Hudson Township covered 25 square miles rather than the 36 which is customary of Ohio townships.

2. Indeed, a person visiting the downtown portion of Hudson would likely estimate the City's population to be only a small fraction of its actual population.

ters of Akron and Cleveland to the more attractive residential areas.[3]

The comprehensive plan ("the plan"), completed in August 1995 and subsequently approved by the city council, engaged in an analysis of Hudson's resources, ability to accommodate the rapid growth and desire to maintain its historic qualities. Central to the plan was the premise that "the current pace of development is straining the community's ability to provide adequate public services and the amenities that are representative of the quality of Hudson life." (Plan at 1). The plan further noted:

> The intent of the Comprehensive Plan is to set predictable target levels that allow Hudson services, infrastructure and schools to be planned. Often decisions are made out of necessity and response to unpredictable growth spurts, resulting in the need for unplanned financial outlays. Through planning and appropriate regulatory mechanisms, much of this unpredictability can be removed.

(*Id.*). The plan noted that, given the existing zoning structure and growth rate of the City, the population could increase to 38,000 to 39,000 in the next two decades. (*Id.* at 10, 12).

The plan noted significant shortcomings in the City's basic infrastructure such as water, sanitary sewers, storm sewers and transportation. It also addressed the City's desire to maintain its "unique quality," particularly in its historic downtown, and noted the threats growth posed to that area:

> [T]he recent years of economic growth and the inevitable revolution of technology and modernization have brought many problems to the downtown historic core. The pressure for expansion and growth is threatening the unique qualities, so zealously guarded by its residents. The problems of traffic congestion, parking, new

development, pedestrian conflicts, and diminishing retailing activity are noticeable. (*Id.* at 47).

The most controversial aspect of the plan is its "Growth Management Strategy." The plan notes that Hudson's sustained growth rate of 3.5 percent per year over a 15–year period is "a pace rarely seen anywhere in the United States on a sustained basis" and is "a rate more typical of cities in developing countries of South America, Asia, or Africa." (*Id.* at 58).[4] This rapid growth contributes to the declining infrastructure and places pressure on schools and public services such as police and fire, according to the plan. "[A] growth management system that addresses the amount, timing, quality, and fiscal impact of development will be an essential tool" in addressing the City's problems, according to the plan. (*Id.* at 59).

The plan recommended that the City adopt an overall maximum population target of under 30,000. (*Id.*). It suggested that the City moderate the pace of population growth to a level of 1 to 1.5 percent annually by limiting its issuance of zoning certificates, which are required before a property owner can receive a building permit. A zoning certificate is needed to apply for a building permit. It recommended awarding permits "on the basis of a point system which includes, but is not limited to[,] infrastructure availability, adequate public facilities, protection of wetlands and stream banks, storm water management capacity, tree conservation, provision of public amenities, finalization of build out of existing subdivisions [and] improvement of [ratio of] jobs to housing balance." (*Id.* at 61).

Pursuant to the plan, the city council adopted an interim development control ordinance in June 1995. That ordinance is the subject of other pending litigation and is not a part of this lawsuit. *See Virginia DiNovi et al. v. The City of Hudson Village et al.,*

---

3. The plan was developed by the consulting firm of Pflum, Klaumeier & Gerhum Consultants, Inc., which in turn consulted three other consulting firms with specialties in environmental planning, downtown issues and growth management mechanisms. A steering committee consisting of local community leaders directed the consul-

tants, and numerous public hearings were conducted, according to the plan. (Plan at 2).

4. Hudson's rapid growth is in the face of an overall decline of population of 1.8 percent in Summit County in the 1980s and an increase of only .5 percent in Ohio in the same period. (*Id.*).

Case No. 5:95–CV–2042 (N.D.Ohio). On May 1, 1996, Hudson replaced the interim order with Ordinance 96–31, which added Chapter 1207 to the City's Planning and Building Code.

Because Chapter 1207 is the core of this lawsuit, a detailed description is helpful. Key elements of its "Purpose and Intent" section follow:

### § 1207.01  PURPOSE AND INTENT

The purpose and intent of this ordinance is to:

.    .    .    .    .

(b) Implement the policies and goals of the 1995 City of Hudson Comprehensive Plan ... relating to growth management strategy, transportation, community facilities and infrastructure, economic development, and community character.

(c) To establish a residential development management and allocation system to control the rate of residential development to ensure that:

(1) Growth is orderly and that municipal infrastructure and public services are available concurrently with such development and to prevent further deterioration of public facility and infrastructure service levels;

(2) The fiscal impact of such development does not exceed revenue available from such development and other sources to pay the cost of infrastructure and services which it necessitates;

(3) The community character of the city as a desirable place to live and conduct business is not eroded and that property values are protected throughout the city;

(4) The density of population in the city is managed carefully to prevent overcrowding and congestion; and

(5) Existing developments are completed and land adjacent to existing subdivisions is developed on a preferential basis to reduce infrastructure extension costs.

Among the "findings" in Section 1207.02 was the following:

(f) That the city needs to moderate the rate of residential development to afford it additional time to prepare plans to provide necessary infrastructure and services to accommodate new residential development, to attract new non-residential development that will provide revenues to the city to assist in the financing of such services and infrastructure, and to maintain reasonable property tax rates, fees, and other charges for its citizens.

The 16–page chapter proceeds to set up a complex system whereby the City prohibits the issuance of a zoning certificate for residential housing unless the applicant possesses an "allotment" granted by the City. The City issues a limited number of allotments each year, determined annually by the council upon the recommendation of the city manager and the municipal planning commission. The number of allotments between now and June 30, 1997, is 100. The ordinance calls for the City to issue the allotments on semi-annual allocation dates in equal amounts.

Eighty percent of the allotments in any year are placed in a "priority" pool and are to be distributed only to the following applicants: 1) those seeking to build "affordable" housing, defined as available to families earning not more than 50 percent of the median family income of Hudson; 2) those seeking to build residences for the elderly or disabled; 3) those seeking to build on lots already having direct access to public streets, or in subdivisions with preliminary or final plat approval prior to the date of enactment of the ordinance; and 4) those seeking to build on lots of at least five acres with access to public streets and water.

The ordinance stated that no single development could receive more than 30 allotments in a single year unless there were no competing applicants. However, applicants could apply for multi-year allotment "reservations" which would count against the total amount of allotments to be distributed in upcoming years.[5]

5. Eligibility for a multi-year allotment hinged on    a number of factors, including a showing that

Although the ordinance provides that "an individual, ownership entity, or organization may submit only one allotment application per *lot* in each allocation period," Sec. 1207.05(c) (emphasis added), the City in its first allocation period allowed developers to submit only one application per *subdivision.*[6] Allotments are awarded on a so-called "pro rata" basis under which each applicant would be guaranteed a minimum of one allotment unless the number of applicants exceeded the number of allotments to be issued, in which case a drawing would be held to award allotments.

The ordinance provided two mechanisms outside the normal allotment process in cases of hardship or special merit. Section 1207.04(i) allows the city council, upon the advice of the city manager and planning commission, to award up to 30 extra allotments to projects meeting one of the following criteria:

(1) At least 25 percent of the units to be built are deed restricted or dedicated to housing for elderly over sixty-two years of age or disabled persons or are classified as affordable housing units as defined in this ordinance;

(2) The project is a mixed-use commercial/residential development that will contribute substantially to the preservation, enhancement and revitalization of the downtown area of the City;

(3) Already approved subdivision plans that are proposed to be redesigned in such a manner that substantially advances the goals of the comprehensive plan and accomplishes one or more of the following purposes: substantially lessens the impact on public services and facilities, reduces overall densities, improves protection of sensitive natural

areas such as wetlands, riparian areas, wildlife habitat, and woodlands, or provides additional public amenities such as parks, green ways, and open space; or

(4) Where exceptional or other unusual conditions exist that are not common to other similarly situated developments and where practical difficulty, as defined in this ordinance, may result from strict compliance with this ordinance, provided that such allotment will not have the effect of nullifying or impairing the intent and purpose of this ordinance.

Second, a person who is shut out of allotments due to losing in the lottery in two consecutive semiannual allotment drawings and maintains that no reasonable use of his property remains due to the failure to receive an allotment may apply for a hardship relief under Section 1207.08(b) of the ordinance. The city council may 1) grant one or more allotments, to be deducted from the total outlay of allotments in the next allocation period or periods; 2) offer to purchase the property or an interest therein; 3) offer other such relief as may be appropriate; or 4) grant no relief.

The ordinance called for the first set of 50 allotments to be distributed on August 15, 1996, upon approval of the municipal planning commission. A total of 84 applications deemed valid by the City competed in the first drawing. Because none of the applicants had a "non-priority" status, the 10 non-priority allotments were added to the 40 priority allotments to create a pool of 50 allotments for the 84 applicants. A random drawing was conducted on July 15, 1996, and the first 50 applications drawn are scheduled to receive allotments upon approval of the

---

extended phased construction is infeasible, the impact on surrounding area would be minimized by relatively quick building, or that innovative design characteristics would minimize the structure's impact on water, sewer and other municipal services. *See* Sec. 1207.04(g).

**6.** The distinction is significant when the amount of applications exceeds the amount of available allotments, necessitating a random drawing for allotments, as happened in the first allocation period. For example, if a hypothetical developer

with 20 lots in a subdivision could submit 20 different applications, he would have 20 chances in the lottery. Instead, by being permitted to submit only a single application per subdivision, the developer has only one chance in the lottery. Although the hypothetical developer's single application can request allotments for all 20 of his lots, if the total number of applications requires a random drawing the developer could receive only one allotment at most.

municipal planning commission on August 15. *See* Section 1207.05(g).

As a result of the random drawing, no applicant received more than one allotment. This includes developers seeking allotments for multiple lots in a subdivision. Documents and testimony indicated that some developers discovered a way to manipulate the system by quit-claiming deeds for lots to others who submitted applications as "owners" of the lots or entering into purchase agreements contingent upon the proposed purchaser's winning of an allotment in the drawing. Other developers were shut out despite submitting applications seeking dozens of allotments.

This action was filed July 10, 1996, by several plaintiffs asserting differing interests. Following are the plaintiffs and their claims:

Mark Schenck is the owner of real property in Hudson known as the Westbridge Subdivision, Phases II and IV. The complaint alleges Schenck borrowed money from a bank to construct streets, put in sewer and water lines, and otherwise develop his subdivision. The loans were to be repaid with proceeds from sale of lots and homes in the developments. Schenck alleges that the growth management ordinance prevents him from recovering his investment and repaying his loan, in violation of his substantive due process rights under the Constitution.

Hudson Land Co., Ltd. ("HLC"), is a limited liability company which owns real property in Hudson known as the Woods of Westbrook. The Woods of Westbrook development has final plat approval and is fully improved with infrastructure. HLC alleges its ability to recoup on its investment is stymied by alleged arbitrary and irrational application of the growth management ordinance and as a result it is about to default on a $950,000 development loan.

Hudson Builders, Inc., is a residential building company conducting business in the City. L & V Equipment Rental, Inc., is a residential development company doing business in the city. Both Hudson Builders and L & V [7] allege that their efforts in developing lots in three Hudson developments are hindered by the ordinance.

Virginia DiNovi is listed in the complaint as a taxpayer, resident and landowner in Hudson. She brings a taxpayer's action, stating that she demanded that the City solicitor halt the enforcement of the growth management ordinance. She alleges that the ordinance subjects her as a taxpayer to potential loss because of future damages in litigation due to the alleged unconstitutional ordinance.

The Home Builders Association of Greater Akron is a trade association consisting of members who are builders, suppliers and tradesmen involved in the building industry in Summit County. Some of its members construct homes and otherwise do business in Hudson.[8]

---

7. The record indicates that Hudson Builders and L & V are related corporations. *See* affidavit of Laura DiNovi Edinger, vice president of both companies, at ¶¶ 3–4. L & V owns property in three Hudson developments. Hudson Builders purchases the lots from L & V upon Hudson Builders' execution of a purchase agreement for construction of a custom home on the lots.

8. Counsel for plaintiffs have informed the Court that the Home Builders Association was named as a plaintiff to represent the interests of builders and developers who are not named plaintiffs in this action but who allegedly suffer damage as a result of the growth management ordinance. The Court sees no need to delve into an extended analysis of the issue of associational standing other than to state it has examined the relevant case law and concluded that the Home Builders Association has standing to represent the interests of the owners and developers of platted lots

in the City who are not named plaintiffs. *See N.A.A.C.P. v. Alabama,* 357 U.S. 449, 458–60, 78 S.Ct. 1163, 1169–71, 2 L.Ed.2d 1488 (1958). The Court finds *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), which held that a homebuilders' organization lacked standing to attack a zoning ordinance, distinguishable. In *Warth,* the homebuilders' organization 1) sought monetary as well as declaratory relief for alleged injuries to its residents, and 2) failed to allege facts sufficient to make out a case or controversy had its members themselves brought suit. The Supreme Court held that the association "failed to show the existence of any injury to its members of sufficient immediacy and ripeness to warrant judicial intervention." *Id.* at 516, 95 S.Ct. at 2214. In this case, the ordinance at issue affects every owner or developer of platted land in Hudson which has not yet been built upon. Rather than name every single owner or developer, the plaintiffs selected several named

James and Elizabeth Dagley and Kevin and Sharon Custer are homeowners in Hudson who live in the Nottingham Gates Estates subdivision. They allege that prior to the enactment of the ordinance, they entered into agreements with their homebuilders who agreed to construct certain recreational facilities in the subdivision upon completion of a designated number of homes. They allege that they had a further understanding that their neighborhood would be complete within a reasonable period of time. They allege their contractual rights are impaired unconstitutionally because the ordinance deprives them of the recreational and neighborhood amenities which were a part of their bargain.

The Court conducted a two-day hearing July 22 and 23, 1996, on the plaintiffs' motion for a preliminary injunction. Representations from counsel and testimony of witnesses indicated that there are approximately 260 to 285 lots in Hudson in which final platting has been approved and improvements are complete. There are an undetermined amount of other lots, estimated to be in the neighborhood of 80 to 100, which have received preliminary or final plat approval but which have not been fully improved.[9]

Among those testifying was Pat Caticchio, a principal in Hudson Land Co., Ltd. ("HLC"), which owns a development called the Woods of Westbrook ("Westbrook"), located in the northwest corner of the City. Caticchio testified that HLC received preliminary plat approval from the City on February 14, 1994. Caticchio testified that in reliance upon such approval, HLC's five members committed $500,000 to purchasing the land and improving the site and also executed a $950,000 development loan with a local bank. He testified that after receiving preliminary approval HLC put in storm sewers, sanitary sewers, water hookups and a bike path easement at HLC's expense. On February 6, 1995, HLC entered into a final plat agreement with the City (Plaintiffs' Exh. 6). The agreement called for HLC to pay more than $23,000 in City inspection costs. It also called for HLC to dedicate to the City all streets and public improvements set forth in the final plat. In return for HLC's improvements, the City promised to "issue building and/or zoning permits provided that the applicants ... have met the necessary requirements for the issuance of said permits." *Id.*

Caticchio testified that the improvements in Westbrook are complete. However, he said the growth management ordinance has prevented HLC from being able to sell the lots, as no one will buy the lots without the assurance that they can build. He received no allotments in the July 15 lottery. In the meantime, HLC has a $7,600 monthly interest payment and only $4,000 in the bank. Caticchio testified that HLC is bankrupt as a consequence of its inability to meet its next interest payment.

Also testifying was Laura DiNovi Edinger, vice president of Hudson Builders and L & V Equipment Rentals. The two companies own property in three developments in Hudson: the Woods of Williamsburg, DiNovi Acres and Nottingham Gates Estates. Edinger testified that she submitted applications for each of the three subdivisions, seeking allotments for a total of 64 lots. She received no allotments at the July 15 drawing. She testified that prior to the City's imposition of growth control, L & V sold approximately 30 lots per year. In 1995, when the interim development control was in effect, L & V sold 12 lots. In 1996, L & V has sold two lots. She said a buyer who tentatively agreed to purchase half of the 36 remaining lots in Phase II of Nottingham

---

plaintiffs and also included the Home Builders Association. The Court finds there are sufficient facts pleaded and evidence presented for the Home Builders Association to have standing to represent unnamed owners of platted land.

9. Platting is a two-step process. Preliminary plat approval determines important design features of a subdivision and is intended to fix the broad outlines of the proposed development.

Upon receiving preliminary approval, the developer engages in improvements on the land such as provision of water, sewer and storm drainage systems and roads, as well as preparation of detailed final plans. A planning commission will not issue final approval unless improvements are complete or the developer posts a bond to cover the cost of improvements. Lots cannot be sold until the plat receives final approval and is recorded.

Gates Estates backed out after becoming aware of the City's growth control plans.

Testifying for the City was James Smith, the city manager. He detailed the City's infrastructure problems and the costs associated with maintenance and upgrade. He testified that improving the water system, which will involve the construction of a connection to the city of Cleveland's water system, is expected to cost $7 million in the next five years and up to $28 million in the next 15 to 25 years. Financing will come from a gradual tripling of sewer rates in the next 15 to 25 years, significant tap-in fees, and attempts to obtain state funding and pass a bond issue.

Smith testified that a $9.2 million sewer improvement is being financed by $750,000 per year dedicated from the city's income tax and an increase in assessments. He testified that the City has spent $5 million to improve its transportation system and needs to spend millions more. A new $3.5 million police facility is needed, as well as additional funding for the hiring of additional police personnel, according to Smith.

Smith testified that the City lacks the funding to accommodate these infrastructure needs and that every new home contributes to the City's deficit. According to the City's calculations, basic non-utility services cost roughly $1,024 per household per year, while the average intake from property taxes is $287 per year. He said the growth management ordinance helps the City meet a schedule for implementing its many necessary improvements. The ordinance also encourages business and industry to come to Hudson Village which otherwise might shy away because of growth problems, according to Smith.

Also testifying for the City was Chris Duerkson, a real estate and growth management consultant for Clarion Associates, the consulting firm which helped draft the growth management ordinance. He testified that when a city experiences growth exceeding 2 to 3 percent annually, it encounters problems in schools, traffic, storm drainage and other areas. He testified that the ordinance enables the City to catch up on its infrastructure problems and is not prejudicial

to owners of platted lots because it places them in the priority pool for available allotments.

Scott Breen, assistant director of community development for the City, explained the lottery system. He testified that under the system, when there are more applicants than allotments (as there were during the first distribution of allotments), no applicant can receive more than one allotment. Thus, for example, HLC, with 29 fully improved lots ready for construction could receive at most an allotment for one lot. He further testified that there are approximately 350 to 375 lots in the City with preliminary or final plat approval but lacking allotments or zoning certificates.

The plaintiffs called as a rebuttal witness George Smerigan, president of Northstar Planning and Design, a planning and consulting firm located in Painesville, Ohio. He testified that Hudson's growth rate, while higher than average, was similar to a number of other communities in northeast Ohio such as Strongsville, Solon, North Royalton, Twinsburg and Jackson Township.

Smerigan testified that in his professional opinion the ordinance was not rationally related to the health, safety or welfare of the residents of the City. He pointed out that the ordinance does not tie growth control limits to specific improvements in infrastructure. Nor are the allotments granted based upon the location of adequate infrastructure:

> It seems to me that if this ordinance truly were tied to the adequacy of the infrastructure, that it would be location sensitive. And it is not. That is to say, the permits that are to be issued would be tied to portions or locations in the community where infrastructure was determined to be adequate to service those permits. And no permits would be issued in areas of the community where the infrastructure was inadequate.

> Instead what we have is sort of a zoning permit bingo where it's totally random. It doesn't relate to location or adequacy of facilities at all. Everything is thrown into the hopper, and you locate permits anywhere within the community. That seems

to me to beg the whole issue of adequacy of infrastructure.

(Smerigan testimony, Docket No. 39, at 10–11). Smerigan said there is no rationality in an ordinance which allows an owner of a single undeveloped lot to have the same chance at receiving an allotment as the owner of 29 lots in an improved development.

Smerigan also testified that the City structured its financial resources to be unable to afford expansion and improvement. He cited as examples the fact that certain levies were permitted to expire as a result of the merger and that the income tax system permitted reciprocity which depleted potential revenue.

### III. FACTORS TO CONSIDER IN PRELIMINARY INJUNCTION ANALYSIS

█ There are four factors that must be considered and "carefully balanced" in deciding whether to issue a preliminary injunction:

1) Whether the plaintiff has shown a strong or substantial likelihood or probability of success on the merits;

2) Whether the plaintiff has shown irreparable injury;

3) Whether the issuance of a preliminary injunction would cause substantial harm to others;

4) Whether the public interest would be served by a preliminary injunction.

*Mason County Medical Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977). These are factors to "simply guide the discretion of the Court," to be balanced and weighed against one another in order to ensure a just result. *See In re Eagle–Picher Indus., Inc.,* 963 F.2d 855, 859 (6th Cir.1992). They "do not establish a rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief." *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 102 (6th Cir.1982).

Plaintiffs' memorandum in support of a preliminary injunction sought relief on three constitutional grounds: substantive due process, equal protection and contracts clause for some of the plaintiffs. Their supplemental memorandum omitted the equal protection analysis and the hearing focussed solely on the substantive due process issue. The Court is of the belief that preliminary relief, if any, is grounded in an alleged violation of substantive due process and will proceed with an analysis accordingly.

### IV. FEDERAL STANDARD OF REVIEW FOR ZONING LEGISLATION

█ The substantive component of the Due Process Clause "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Pearson v. City of Grand Blanc,* 961 F.2d 1211, 1220 (6th Cir.1992) (quoting *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990)). In the context of land use regulation, citizens have a substantive due process right not to be subjected to arbitrary or irrational zoning actions. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 263, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977). While safeguarding this substantive due process right, federal courts must be cognizant of the deference paid to local land use decisions. The Sixth Circuit in *Pearson, supra,* emphasized the narrow scope of the federal inquiry. *Pearson* noted the distinction between federal review of zoning administrative decisions and zoning legislative ordinances:

Where a substantive due process attack is made on state *administrative* action, the scope of review by the federal courts is extremely narrow. To prevail, the plaintiff must show that the state administrative agency has been guilty of arbitrary and capricious in the *strict* sense, meaning that there is no rational basis for the administrative decision.

... The administrative action will withstand substantive due process attack unless it is not supportable on any rational basis or is willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case.

.    .    .    .    .

Where zoning *legislation* is subjected to substantive due process attack, the scope of review by the federal court is the same

as for any other legislation—even more deferential than for state administrative action.

.    .    .    .    .

[F]ederal court review of a zoning ordinance may only determine whether it is clearly arbitrary and unreasonable, in the very restricted sense that it has no substantial relation to the public health, safety, morals or general welfare.

*Pearson*, 961 F.2d at 1220, 1223 (emphasis in original) (citations omitted).

Thus a federal court must tread lightly upon the decisions of local governments regarding land use. This is all the more true when a zoning ordinance, i.e., zoning legislation, is under attack, as in the instant case. A court does not operate as a super-zoning board. However, after giving all due deference, a court cannot ignore its vital role of ensuring that those with a constitutionally protected interest are not subject to arbitrary or irrational zoning actions. It is with this standard in mind that the Court proceeds with its analysis.

## V. APPLICATION OF PRELIMINARY INJUNCTION FACTORS

### 1. Likelihood of Success on the Merits

■ Upon review of the testimony and evidence of record, the Court finds that the plaintiffs have established a strong likelihood of success at trial on the issue of whether the ordinance is arbitrary and irrational as applied to owners and developers of property which has received preliminary or final plat approval.

The City supports the ordinance on two broad premises: 1) the current rate of development is outstripping the City's infrastructure capabilities; and 2) the City has a legitimate interest in preserving its "community character." *See* § 1207.01(b). These goals are not *per se* unreasonable. However, plaintiffs have established a strong likelihood of proving at trial that there is no rational relationship between the goals and the outcome of the ordinance's application to owners of already platted lots.

The City expends a great deal of effort outlining its infrastructure needs, its lack of sufficient finances to handle its problems, and the purported increase in infrastructure problems with the construction of each new home.

Based upon testimony and documentary evidence, the Court does not doubt that the City faces significant expenses in improvements of its water, sanitation, transportation and public safety systems. However, there is also little doubt that the City will incur such expenses even if another house is never built. It does not appear rational to deny zoning certificates to owners of approximately 300 to 350 platted lots on the basis that the village will have to expend significant resources to enhance and maintain services for its entire village, including 7,000 or so existing homes. Such a position has the effect of penalizing developers of new homes for the financial problems of the entire city.

This is particularly true with respect to developments in which the needed infrastructure is in place. The City offers no explanation why its infrastructure costs would increase upon the construction on the 29 lots in Westbrook. HLC has already put the infrastructure in place at its own cost. Plaintiffs have established a strong likelihood of proving that denial of zoning certificates to owners of lots in Westbrook—which already has roads, curbs, storm sewers, access to water and the like—on the basis of infrastructure costs is not rational.

Moreover, the Court is not persuaded by the City's assertions of inability to pay for infrastructure improvements. The City taxes its residents at relatively low rate of 1 percent and engages in income tax reciprocity with other local governments, effectively waiving income tax for residents who pay income tax where they work. Testimony indicated that the City is not sure how many dollars are lost through the practice of reciprocity. The City should not be allowed to potentially undertax its residents and then assert its weak financial status as a justification for controlling growth, at least at the expense of those who have invested in the community by improving platted land.

The City argues that each new home creates a net financial debt for the City. It states that the City pays approximately $1,024 per household per year in non-utility operating costs while taking in an average of $287 per household in real estate costs, leaving a per household deficit of approximately $737. This argument suffers in several respects. First, the $1,024 per household is derived from the simplified process of dividing overall non-utility operating costs by number of households in the City. It fails to attribute any of its costs to commercial, industrial, or any other types of structures other than homes. Second, the purported deficit fails to take into account income taxes or any other fees paid by residents of the homes. Third, the $287 per household real estate tax is derived from calculations based upon a $200,000 home, while testimony indicates that the average cost of a newly constructed home is $320,000. (Depo. of assistant community development director Scott Breen at 25).

In sum, plaintiffs have established a likelihood of proving at trial that the City's infrastructure-related justification of the growth management ordinance, which results in denial of zoning certificates to owners of already platted lots for reasons of the City's overall purported poor financial status, results in an arbitrary deprivation of those owners' property interest. There is insufficient evidence that these lots' proportional contribution to the City's overall financial problems merits the City's denial of zoning certificates.[10]

Plaintiffs also have established a likelihood of proving that in addition to being arbitrary as applied to owners of platted lots, the ordinance is irrational in its allocation distribution process. In proposing adoption of a growth management ordinance, the City's comprehensive plan suggested awarding zoning certificates on a merit basis, based upon factors such as infrastructure availability, adequate public facilities, protection of wetlands and stream banks, storm water management capacity, tree conservation, provision of public amenities, finalization of build out of existing subdivisions and improvement of the City's jobs-to-housing ratio. (Plan at 61). The City incorporated no such basis in its ordinance. Instead it distributes lots on a pro rata basis, with each applicant receiving at least one allotment unless the number of applicants exceeds available allotments. In the latter case, the City conducts a lottery to determine who receives allotments. Upon questioning by the Court, the City's assistant director of community development acknowledged that under the ordinance, a person owning an undeveloped lot with no improvements, in a plat which has received final approval,[11] has the same chance of receiving one allotment as HLC, which has invested some $1.4 million to establish 29 ready-to-build lots in its subdivision.

Thus while Hudson argues that infrastructure problems are the root of its growth management plan, the ordinance fails to make any rational connection between those perceived problems and its purported solution, i.e., a limit on new construction unrelated to the specific infrastructure problems. Plaintiffs have established a likelihood of proving at trial that the indiscriminate nature of the ordinance, failing to consider the specific impact of the proposed developments on the City's legitimate needs, renders it irrational as applied to owners of already platted lots.[12]

10. The City argues that it is *not* denying zoning certificates to owners of those lots; it is merely allotting them at an orderly pace. However, HLC's Caticchio testified he received no allotments for his 29 lots at the July 15 drawing. L & V's Edinger testified that she submitted applications for a total of 64 lots in three subdivisions and received no allotments. Under the ordinance, when enough applications have been submitted to necessitate a lottery, a developer can obtain a maximum of one lot per development. Thus as a practical matter, the zoning certificates are meted out so parsimoniously that they are in effect a denial of the ability to go forward with a development at anything other than a snail's pace.

11. Because the City will issue final approval to unimproved plats so long as the developer issues a bond guaranteeing future improvements, a person owning an unimproved lot can be in the position to seek a zoning certificate.

12. Further evidence of the irrationality of the City's proposed solution to its infrastructure problem is the fact that the ordinance was apparently manipulated by certain developers. To

In sum, the Court finds that the plaintiffs have established a likelihood of proving that the ordinance is arbitrarily and irrationally applied to owners of platted lots and therefore is not rationally related to the health, safety or welfare of the local community.[13]

This conclusion is buttressed by the limited case law regarding growth control ordinances. Although neither side could provide a case directly on point, the cases generally support the proposition that growth control ordinances are permissible only if they are 1) limited in duration and 2) tied to a specific and prompt plan for whatever corrective action is needed to lift the control on growth. *See, e.g., Almquist v. Town of Marshan,* 308 Minn. 52, 245 N.W.2d 819 (1976) (six-month moratorium on building permissible in part because of limited duration and town's prompt action to adopt comprehensive zoning plan); *Golden v. Planning Bd. of Ramapo,* 30 N.Y.2d 359, 334 N.Y.S.2d 138, 285 N.E.2d 291, *app. dism.,* 409 U.S. 1003, 93 S.Ct. 436, 34 L.Ed.2d 294 (1972) (ordinance tying issuance of permits to capital improvements held valid); *Conway v. Town of Stratham,* 120 N.H. 257, 414 A.2d 539 (1980) ("slow growth" ordinance permissible but could not extend beyond one year without master plan).

In this case, there is no "sunset" provision to the ordinance. Although the number of allotments to be issued is subject to annual review, such a review is hardly a guarantee of relaxation of growth controls. To the contrary, the review would allow the City to *decrease* the number of available allotments, even to zero. Further, unlike growth management ordinances accepted by other courts, the ordinance does not provide a suf-

ficient, specific link to infrastructure improvements. Finally, the facts of this case do not resemble the handful of cases which permit comprehensive and long-term growth control. Those cases tend to involve highly populated suburban areas threatened by rapid and uncontrolled growth. *See, e.g., Construction Ind. Ass'n of Sonoma County v. City of Petaluma,* 522 F.2d 897 (9th Cir. 1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976) (San Francisco suburb which grew 25 percent in two years). While growing at a relatively high rate compared to the state as a whole, Hudson Village's population increase or density does not reach the magnitude of such cases.[14]

### 2. Whether the Plaintiffs Have Shown Irreparable Injury

Chapter 1207 is designed to slow residential development in the City. Most residential development takes place on lots in approved platted subdivisions. A building permit is required before construction can begin on a residential lot. A building permit does not issue unless the owner of the lot has a valid zoning certificate. Chapter 1207 restricts the number of zoning permits that can be issue in any given year. Plaintiffs Schenck, HLC, Hudson Builders Inc. and L & V Equipment Rental Inc. own lots in platted subdivisions within the City of Hudson. Caticchio's testimony made a strong case for the proposition that as a member of HLC he is in immediate danger of irreparable injury in connection with his ownership interests in the platted and improved subdivision known as Woods of Westbrook. He offered compelling testimony during the evidentiary hearing that he and his partners invested more than

avoid the negative impact of receiving only one allotment per development, certain developers executed quit-claim deeds of certain lots to individuals who then applied for an allotment of their own. In addition, developers entered purchase agreements with buyers contingent on the buyers' receiving an allotment in the lottery. In this way certain subdivisions received several allocations. Developers who did not employ such tactics received a maximum of one allotment per subdivision.

13. The City's second asserted premise justifying the ordinance, the preservation of "community character," was not advanced during the two-day

hearing and merits little discussion here. It is enough to note that there is no evidence supporting a theory that construction on lots in subdivisions already platted for residential development is somehow harming the community's character.

14. In *Petaluma,* the number of building permits increased nearly fourfold in a four-year period, rising from 234 in 1967 to 891 in 1971. *Petaluma,* 522 F.2d at 900. Without any increases due to merger (such as is the case with Hudson Village), the population grew from a little over 10,000 in 1950 to more than 30,000 in 1972. *Id.*

$1.4 million based upon the City's assurances. HLC is on the verge of defaulting on a $950,000 development loan because the City's ordinance impairs its ability to sell the 29 lots, as potential buyers are not likely to purchase a lot with no idea when they can build on it.

The recent drawing for allotment of zoning certificates further demonstrates the continuing nature of the irreparable injury to HLC in its ownership of the Woods of Westbrook. There were 84 applicants for allotments in the July 1996 drawing and the Woods of Westbrook owners were totally shut out as to receipt of even one zoning certificate. Absent injunctive relief it is certain that the company will suffer irreparable injury.

Plaintiff Mark Schenck also established irreparable injury. He stated in an affidavit that in May 1995 he executed a $620,000 development loan to be repaid in three years, the anticipated time frame expected to sell the 27 lots in the two phases of the Westbridge Development which he owns. He stated that the ordinance impairs his ability to sell lots to builders in the subdivision, thus effectively denying him the value of his investment.

Similarly, Hudson Builders Inc. and L & V Equipment Rental Inc. provide evidence of irreparable injury. The testimony and affidavit of Edinger detail the loss of business due to the growth control ordinance as well as L & V's potential default on a $1.3 million development loan.

Plaintiff Home Builders Association of Greater Akron has not established irreparable harm. However, on balance, plaintiffs have established that enforcement of the ordinance would cause irreparable harm.

### 3. Whether Issuance of a Preliminary Injunction Will Cause Substantial Injury to Others

The merger of the former City of Hudson Village and Hudson Township into a city of 25 square miles has resulted in the growth problems of the area falling upon the City of Hudson governing body, i.e. the city manager and the city council. The comprehensive plan addressed the problems involved in managing the infrastructure of the new City and provided a rationale for the proposition that growth within the expanded newly created city needed to be managed in some fashion because the infrastructure for the City was in jeopardy. The City has advanced the proposition that it loses money in the context of added tax revenue for each new house built because the additional residence adds to the fixed costs of the city in a magnitude that outstrips additional income to be realized by the additional property taxes. The plaintiffs have contested the city's analysis by a study by the accounting firm, Coopers & Lybrand, L.L.P. Giving the City the benefit of the doubt, the Court finds that the injunctive relief proposed will cause some incremental infrastructure cost increases, but the Court finds that the harm would not be substantial in the context of the City's overall projected infrastructure costs.

### 4. Whether the Public Interest Would be Served by a Preliminary Injunction

The public has an abiding interest in the maintenance of land use controls that are not either arbitrary or irrational in their implementation. In the court's view, that interest outweighs the interest of the public, i.e., the present citizens of the City, in receiving the customary services of a municipality such as police and fire protection, comprehensive traffic control, good roads, water, and storm and sanitary sewer services at the lowest possible cost.

Consequently, the court finds that the public interest will be served by a preliminary injunction.

### VI. DECISION AND SCOPE OF REMEDY

In the Court's view, the likelihood of success factor is the dominant factor in this preliminary injunction analysis. Given the Court's preliminary view of the plaintiffs' likelihood of success and its additional view that the other preliminary injunction factors tend to favor the plaintiffs, and keeping in mind the Court's narrow scope of review as articulated in *Pearson, supra,* the Court finds that the granting of a preliminary injunction is the proper result of this case.

The next step is in fixing the proper scope of injunctive relief. Given the prior analysis, the Court finds the proper injunctive relief is as follows:

The City shall be preliminarily enjoined from enforcing Chapter 1207 of its Zoning Code as to:

a. Any lots in the City which have obtained preliminary or final plat approval and are currently improved with 1) water service or well water available; 2) sewer or septic service, and 3) roads; and

b. Any other lots in the City which, as of the date of this order, have obtained preliminary or final plat approval and are not currently improved with the infrastructure outlined in (a) above; but only when those other lots are fully improved with such infrastructure.

The record includes varying figures as to exactly how many lots fit the description of (a) and (b), although the parties agree that the total number of platted lots without zoning certificates is in the neighborhood of 300 to 350. Given its specific definition of categories, the Court sees no need to affix a specific number.

Although it is not clear in the record, the Court understands that under the City's zoning ordinance, a zoning certificate lapses if construction does not begin within six months of issuance.[15] In granting this preliminary injunctive relief, the Court in no way intends to modify or adjust this or any other requirement other than what is specifically set forth in the Court's judgment entry granting injunctive relief.

Pursuant to Fed.R.Civ.P. 65(c), the Court orders the plaintiffs to deposit with the clerk of courts in Akron a cash or surety bond in the sum of $25,000 as security for the payment of such costs and damages as may be incurred or suffered by the City should it be found to have been wrongfully enjoined.

The order shall become effective upon the plaintiffs' deposit of such bond.[16]

## VII. CONCLUSION

For the reasons set forth above, the plaintiffs' motion for a preliminary injunction is granted. The Court will publish a judgment entry contemporaneously with the issuance of this opinion stating the scope of the preliminary relief.

IT IS SO ORDERED.

### JUDGMENT ENTRY GRANTING PRELIMINARY INJUNCTION

For the reasons set forth in the Memorandum Opinion filed contemporaneously with this Judgment Entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that the plaintiffs' motion for a preliminary injunction is granted to the following extent:

The City of Hudson Village shall be preliminarily enjoined from enforcing Chapter 1207 of its Zoning Code as to:

a. Any lots in the City which have obtained preliminary or final plat approval and are currently improved with 1) water service or well water available; 2) sewer or septic service, and 3) roads; and

b. Any other lots in the City which, as of the date of this order, have obtained preliminary or final plat approval and are not currently improved with the infrastructure outlined in (a) above; but only when those other lots are fully improved with such infrastructure.

The order shall become effective upon the plaintiffs' deposit with the clerk of courts in Akron a cash or surety bond in the amount of $25,000 as security for the payment of such costs and damages as may be incurred or

---

**15.** In the Court's view, the fact that a zoning certificate lapses after six months should alleviate the City's concerns that there will be a rush to the courthouse for zoning certificates and a concomitant surge in pressure on the City's infrastructure.

**16.** Counsel for the City has informally indicated to the Court that no difficulty is expected in administering this order. However, in the event difficulties do arise, the parties are directed to notify the Court, which will consider the appointment of a master to adjudicate any disputes.

suffered by the City should it be found to have been wrongfully enjoined.

IT IS SO ORDERED.