PAWN AMERICA MINNESOTA,
LLC, Appellant,

v.

CITY OF ST. LOUIS PARK,
Minnesota, Respondent.

No. A08–1697.

Supreme Court of Minnesota.

Aug. 26, 2010.

Scott G. Harris, Matthew B. Seltzer, Aleava R. Sayre, Leonard, Street and Deinard, Minneapolis, MN; and Eileen M. Roberts, St. Paul, MN, for appellant.

Thomas M. Scott, Campbell Knutson, Eagan, MN, for respondent.

Susan L. Naughton, League of Minnesota Cities, St. Paul, MN, for amicus curiae League of Minnesota Cities.

## OPINION

ANDERSON, G. BARRY, Justice.

At issue here is the scope of a municipality's authority to adopt an interim zoning ordinance that placed a moratorium on the establishment of pawnshops within the municipality. Appellant Pawn America Minnesota, LLC, sought declaratory and injunctive relief, asking the district court to (1) declare invalid an interim ordinance adopted by respondent City of St. Louis Park that placed a moratorium on the establishment of pawnshops and the issuance of new pawnbroker licenses, (2) declare that Pawn America is legally entitled to a pawnbroker license, and (3) direct the City to issue a pawnbroker license. Pawn America and the City filed cross-motions for summary judgment. The district court concluded that the interim ordinance was validly enacted, and Pawn America was not entitled to a pawnbroker license because the property it purchased could not be used as a pawnshop under the permanent ordinance. Consequently, the court denied Pawn America's motion for summary judgment, granted the City's motion for summary judgment, and dismissed Pawn America's claims with prejudice. Pawn America appealed, and a divided court of appeals affirmed. *Pawn Am. Minn., LLC v. City of St. Louis Park,* No. A08–1697, 2009 WL 2447746, at *1, 6 (Minn.App. Aug.11, 2009). Because we conclude that the interim zoning ordinance was validly enacted, we affirm.

Pawn America applied to the City of St. Louis Park on June 7, 2007, for a license to operate a pawnshop at 5600 Excelsior Boulevard.[1] The City's assistant zoning administrator issued a zoning verification letter confirming that the intended use of the property "as a pawn store, secondhand goods store, precious metals dealer and an industrial loan and thrift company" complied with the City's zoning code, but noted that other requirements, such as a certificate of occupancy and registration of land use, may be necessary.[2] When Pawn America applied for a pawnbroker license on June 7, the city code permitted two pawnbroker licenses in the City; one license had already been issued, and Pawn America was applying for the second license.

On the same day that Pawn America applied for a pawnbroker license, PAL

---

1. The City requires a pawnbroker license before operating a pawnshop.

2. At the time of the application, the applicable zoning designation on the property was C–2, general commercial. Pawn America did not submit the registration of land use application until September 28, 2007.

Holdings, LLC, an operating affiliate of Pawn America, entered into a purchase agreement to acquire the property located at 5600 Excelsior Boulevard. PAL Holdings planned to lease the property to Pawn America, and the closing on the property was set for October 31, 2007. A contingency provision in the purchase agreement provided that the agreement could be canceled and the $30,000 in earnest money refunded if final governmental approvals and licenses could not be obtained by July 16, 2007.[3]

With the July 16 governmental-approval contingency-period deadline approaching, Pawn America's attorney contacted the City's inspections supervisor on July 13, 2007, to advise her of the contingency-period deadline and to inquire about the status of Pawn America's license application. On July 16, the inspections supervisor sent an e-mail to Pawn America's attorney stating that "[e]verything looks great for the license. I cannot, however, physically issue this license until the store is ready to be open, but as far as we are concerned, the paperwork is in order and the license will be issued as soon as the store is ready for business." The inspections supervisor also left a voicemail for Pawn America's attorney indicating that she could not issue a pawnbroker license until Pawn America had a signed lease or had the property in its name.

In September 2007 residents near 5600 Excelsior Boulevard learned that Pawn America would be operating at that location, and the residents expressed to a city council member their concerns about and opposition to Pawn America there. The council member contacted the city manager and the community development director on September 23 to relay these concerns and inquire about the status of the license application. The council member wrote in an e-mail that if there were any available pawnbroker licenses, "lets [sic] lower the number allowable asap." The city manager then instructed the inspections supervisor to wait before approving the application, but the inspections supervisor did order the required background check.[4]

On September 24, 2007, the city council held a regularly scheduled meeting, and the city manager initiated discussion about Pawn America's license application. The city manager stated that city ordinances permitted two pawnbroker licenses; one was currently in use, and one was still available. He told the city council that in 2002 the pawnshop ordinance was amended to reduce the number of licenses available from three to two, and to impose reporting requirements on pawnshops to track stolen property. The mayor expressed opposition to Pawn America's application, apparently because of the location of the property, and said, "Here's my policy statement on it: Figure out a way to say 'no.' Anybody else have anything different about it, I mean ... I don't know, I think that's a terrible location for it. That's just my take on it." A council member expressed opposition to pawnshops in general, and in particular, said that a pawnshop on Excelsior Boulevard would negatively impact the community's image because of the downtown location

---

3. If a cancellation occurred between July 16, 2007, and August 31, 2007, $7,500 of the earnest money was nonrefundable.

4. By local ordinance, a pawnbroker license application must be referred to the police department for verification and investigation of the facts in the application. Pawn America's application was the first pawnbroker application the inspections supervisor had processed, and the supervisor apparently had not ordered the background check in June 2007 when Pawn America originally submitted an application for a pawnbroker license.

and proximity to Highway 100. The city attorney clarified that the zoning on the property permitted a pawnshop, but suggested that the City could adopt a moratorium on new pawnshops by interim ordinance, and initiate a study in order to decide whether the City wanted to implement any additional conditions or restrictions on pawnshops.

On September 26, 2007, the city attorney informed Pawn America that the city council on October 1 would have a first reading of an interim ordinance and would impose a moratorium on opening new pawnshops. Because of this information, and because the inspections supervisor indicated in July that a pawnbroker license would be issued when Pawn America had a lease or title to the property, PAL Holdings entered into a lease agreement with the owner of the property on September 27, 2007, and entered into a sublease agreement with Pawn America. The next day, Pawn America submitted a signed certificate of occupancy and land use registration application, and requested immediate issuance of a pawnbroker license.[5] The City would not issue the license because of the pending moratorium on new pawnshops, and because the City had not yet completed the background check on Pawn America.

On October 1, 2007, the city council met again and adopted the first reading of an interim zoning ordinance that temporarily prohibited new pawnshops, and passed a resolution directing a study to determine how the City should regulate pawnshops. The resolution also placed a hold on any further processing and approval of pending or new pawnshop licenses. As required by the city charter, every ordinance must have two public readings, with seven days between the first and second readings. In addition, an ordinance must be published in the City's official newspaper; the ordinance is effective 15 days after publication. On October 3, before the second reading of the ordinance, the City sent the interim ordinance to the official city newspaper for publication on October 11, making October 26 the effective date of the interim ordinance.[6]

On October 4, 2007, Pawn America brought an action in district court seeking a writ of mandamus to compel the City to issue a pawnbroker license. The court issued an alternative writ of mandamus requiring the City to issue the license or appear before the court on October 8 to show cause why the City had not issued a license pursuant to Pawn America's June 7 application. At the October 8 hearing, the court denied Pawn America's petition for a peremptory writ of mandamus.

The city council held a special meeting on October 8, 2007, and adopted the second reading of the interim ordinance that temporarily prohibited the further processing and approval of pending or new applications for a pawnbroker license.[7] Two days later, Pawn America filed an amended mandamus petition that asked for declaratory and injunctive relief. In

5. In spite of the lease and sublease agreements, the property owner at the time, Trestman Music, told the City's director of inspections on October 1 that the music store would be operating there until the closing on October 31, and would move to a new location at that time.

6. At the time the underlying events took place, the City's newspaper was published every Thursday and the publication deadline

was the Thursday prior to publication. The October 26 effective date was five days prior to PAL Holdings' scheduled closing date of October 31 on the property.

7. The only item on the agenda was the second reading of the interim ordinance. The duration of the interim ordinance was proposed to last nine months.

addition, Pawn America filed a motion for a temporary restraining order under Minn. R. Civ. P. 65.01, asking the court to enjoin the enforcement of the moratorium with respect to Pawn America. On October 22, 2007, the district court denied the temporary restraining order, and the interim ordinance went into effect on October 26.

Pursuant to the resolution passed at the October 1 city council meeting, a zoning study on pawnshops was conducted, and the study was completed on December 5, 2007. The zoning study analyzed pawnshop uses, the City's existing zoning and licensing regulations, and land use controls in other cities. Based on the study, the City adopted a permanent ordinance on February 4, 2008, that became effective on February 22, 2008. Among other changes suggested by the study, the permanent ordinance amended the zoning code to make pawnshops conditional uses, and includes a distance separation requirement between pawnshops, gun shops, liquor stores, and certain other businesses, prohibits pawnshops from being located within 350 feet of residentially zoned property, and prohibits firearm transactions. Because the property at issue abuts a single-family neighborhood, a pawnshop is not permitted there under the permanent ordinance.

Pawn America moved for summary judgment, asking the district court to declare the interim ordinance invalid because it was adopted for an improper purpose (to delay or prevent Pawn America from opening a pawnshop), and to declare that Pawn America is entitled to a license. Pawn America also asked the court to order the City to issue a pawnbroker license. The City filed a cross-motion for summary judgment and asked for dismissal of Pawn America's claims because the interim and permanent ordinances do not allow a pawnshop at the property.

The district court denied Pawn America's motion for summary judgment, granted the City's motion for summary judgment, and dismissed Pawn America's claims. The court analyzed the City's actions in light of Minn.Stat. § 462.355, subd. 4(a) (2008), which authorizes a municipality to enact an interim ordinance. The court determined that the City's adoption of the interim ordinance was not arbitrary or capricious because it is permissible to preserve the status quo pending further study of zoning. The court reasoned that the mere adoption of an interim ordinance after learning of a particular proposed use of property does not, in itself, mean that enactment of an ordinance is arbitrarily enacted to delay or prevent the project. Because the court concluded that the interim ordinance was valid, and a pawnshop is not permitted by the permanent ordinance in place, the court granted summary judgment for the City.

Pawn America appealed, and the court of appeals affirmed. *Pawn Am.*, 2009 WL 2447746, at *1, 6. The court of appeals analyzed the language of Minn.Stat. § 462.355, subd. 4(a), and concluded that the City met the statute's requirements when adopting the interim ordinance. *Pawn Am.*, 2009 WL 2447746, at *3–4. In reaching its conclusion, the court of appeals determined that the City had not acted arbitrarily by enacting the interim ordinance even though the ordinance was in response to Pawn America's pawnbroker license application. *Id.* at *5–6. The court reasoned that enacting an interim ordinance in response to a particular license application does not, by itself, make the ordinance arbitrary. *Id.* at *5. The court found it noteworthy that the City had not reviewed its pawnshop ordinances in over five years, and Pawn America's operation was going to be structurally different than the City's other pawnshop in

that Pawn America would have check-cashing and "other adult-oriented services." *Id.* Further, the interim ordinance's moratorium on the establishment of pawnshops was only temporary while the City studied current zoning practices, allowing the City to engage in planning and to address public safety and welfare concerns. *Id.* at *6.

The court of appeals dissent concluded that the interim ordinance and the zoning study were merely a guise to stop the Pawn America project. *Id.* at *6 (Stauber, J., dissenting). The dissent viewed the City's actions as "political manipulations [that] began long after Pawn America had justifiably and detrimentally relied on the city's preliminary approvals ... [and involved] open and obvious discrimination against a complying 'single project.' " *Id.* at *6–7. This appeal followed.

 Pawn America argues that the district court erred in concluding that the City's interim ordinance was valid. In an appeal from summary judgment, we must determine whether there are any genuine issues of material facts and whether the district court erred in applying the law.[8] *Frieler v. Carlson Mktg. Group, Inc.*, 751 N.W.2d 558, 564 (Minn.2008). When doing this, we must look at "the evidence in the light most favorable to the party against whom judgment was granted." *Id.* (citation omitted) (internal quotation marks omitted). Pawn America's argument requires us to interpret Minn.Stat. § 462.355. Statutory interpretation is a question of law, which we review de novo. *Calm Waters, LLC v. Kanabec County Bd. of Comm'rs*, 756 N.W.2d 716, 719 (Minn. 2008).

Minnesota Statutes § 462.355, subdivision 4(a), gives authority to a municipality,

under certain conditions, to adopt an interim ordinance:

> If a municipality *is conducting studies or has authorized a study to be conducted* or has held or has scheduled a hearing for the purpose of considering adoption or amendment of a comprehensive plan or official controls as defined in section 462.352, subdivision 15 ... the governing body of the municipality *may adopt an interim ordinance* applicable to all or part of its jurisdiction *for the purpose of protecting the planning process and the health, safety and welfare of its citizens.* The interim ordinance may regulate, restrict, or prohibit any use, development, or subdivision within the jurisdiction or a portion thereof for a period not to exceed one year from the date it is effective.

(Emphasis added.)

### A. The Timing Requirement

 Pawn America first argues that Minn.Stat. § 462.355, subd. 4(a), requires a study to be under way or authorized before a city may adopt an interim ordinance, based on the statutory language "is conducting studies or has authorized a study to be conducted." Because the City authorized the study at the October 1 city council meeting at the same time the City adopted the first reading of the interim ordinance, Pawn America contends that the interim ordinance was invalid.

The statute does not specify whether the study must be authorized prior to the adoption of the first reading of an interim ordinance, or prior to the final adoption of an ordinance; it merely provides that a "municipality may adopt an interim ordinance." Minn.Stat. § 462.355, subd. 4(a). The city charter provides that every non-emergency ordinance must have two public

---

**8.** At the May 19, 2008, hearing on the cross-motions for summary judgment, both parties agreed that there are no material facts in dispute.

readings, unless a reading is waived. This suggests that the ordinance at issue here was not "adopted" until two public readings occurred. Accordingly, reading Minn. Stat. § 462.355, subd. 4(a), in conjunction with the city charter supports the City's claim that the zoning study was authorized on October 1 before the City "adopted" the interim ordinance on October 8 when the City adopted the second reading of the ordinance.

Nevertheless, even if we interpret the word "adopted" in Minn.Stat. § 462.355, subd. 4(a), to mean the adoption of the first reading of the interim ordinance, Pawn America's argument is still flawed. The statutory language provides that a city may adopt an interim ordinance if the city "is conducting studies or has authorized a study to be conducted." Minn.Stat. § 462.355, subd. 4(a). At the October 1 city council meeting, the City adopted the first reading of the interim ordinance in the same motion as the resolution authorizing the zoning study; therefore, there was a simultaneous authorization of the study and adoption of the ordinance. Although the plain language of the statute certainly contains a temporal requirement by stating that a city may adopt an interim ordinance if it "is conducting studies or has authorized a study to be conducted," that requirement is met when the authorization of the study and adoption of the ordinance occur at the same time. We conclude that even under the strictest of interpretations, the City did not adopt the interim ordinance until it authorized the study, thereby satisfying this statutory requirement.

*B. Purpose of the Ordinance*

■ Pawn America also argues that the interim ordinance was invalid because, according to Pawn America, the City did not adopt the ordinance "for the purpose of protecting the planning process and the health, safety and welfare of its citizens." *See* Minn.Stat. § 462.355, subd. 4(a). Pawn America contends that the sole purpose of the interim ordinance was to prevent Pawn America from obtaining a pawnbroker license, and that this is evidenced by numerous events, including the City's delay in processing the application and the City's efforts to make the effective date of the ordinance as early as possible.[9] Pawn America cites *Almquist v. Town of Marshan,* 308 Minn. 52, 64, 245 N.W.2d 819, 826 (1976), for the proposition that in order for the interim ordinance to be valid, the City was required to enact the ordinance "in good faith and without discrimination," but did not do so here.

We have not previously addressed the standard of review for analyzing the validity of an interim ordinance. Our decision in *Almquist* predates statutory authority for municipalities to adopt interim ordinances. Nevertheless, in *Almquist* we held that even without a statutory grant of authority, "where a municipality enacts in good faith and without discrimination, a moratorium on development which is of limited duration, is valid if upon enactment, the study proceeds promptly and appropriate zoning ordinances are expeditiously adopted when it is completed." 308 Minn. at 65, 245 N.W.2d at 826. The same day that *Almquist* was decided, April 2, 1976, the Legislature enacted the first version of Minn.Stat. § 462.355, subd. 4(a), granting municipalities statutory authority to adopt interim ordinances. *See* Act of Apr. 2, 1976, ch. 127, § 21, 1976 Minn. Laws 304 (codified at Minn.Stat. § 462.355, subd. 4(a)). The statute, as enacted in

---

**9.** Pawn America also contends that the City delayed commencing the background check, and notes that the City sent the interim ordinance to the city newspaper for publication after the first reading on October 1 instead of after the second reading on October 8.

1976, *see id.,* and in its current version, *see* Minn.Stat. § 462.355, subd. 4(a), does not contain an express reference to a good-faith or non-discrimination requirement. But Minn.Stat. § 462.355, subd. 4(a), does require that the interim ordinance be adopted "for the purpose of protecting the planning process and the health, safety and welfare of its citizens."

Implicit in the statutory language is a requirement that a municipality not act unreasonably, arbitrarily, or capriciously because the ordinance must be legitimately tied to the planning process and public health, safety, and welfare. In this sense, the statutory language arguably embodies the *Almquist* good-faith requirement.[10] *See* Minn.Stat. § 462.355, subd. 4(a); *Almquist*, 308 Minn. at 62, 63, 245 N.W.2d at 825 (conducting a good-faith analysis by determining whether the moratorium was arbitrary, capricious, or unreasonable). Although we have not previously reviewed the vitality of *Almquist* or interpreted Minn.Stat. § 462.355, subd. 4(a), the court of appeals has concluded that *Almquist* has continued applicability and the statute precludes arbitrary or capricious conduct. *See, e.g., Duncanson v. Bd. of Supervisors*

*of Danville Twp.*, 551 N.W.2d 248, 250 (Minn.App.1996) ("A moratorium will be upheld unless it is determined that a zoning authority acted arbitrarily in adopting it."), *rev. denied* (Minn. Sept. 20, 1996); *Medical Servs., Inc. v. City of Savage*, 487 N.W.2d 263, 267 (Minn.App.1992) ("A municipality may not arbitrarily enact an interim moratorium ordinance to delay or prevent a single project."). This approach comports with our statement in *Honn v. City of Coon Rapids*, 313 N.W.2d 409, 417 (Minn.1981), where we said that in reviewing a zoning authority's actions, the standard is whether the action has a reasonable basis, or is unreasonable, arbitrary, or capricious.[11]

Reading the requirement in Minn.Stat. § 462.355, subd. 4(a), that a city must enact an interim ordinance "for the purpose of protecting the planning process and the health, safety and welfare of the city's citizens" in light of our prior case law, we review the validity of an interim ordinance by determining whether the ordinance is reasonably related to the planning process and the public health, safety, and welfare,

---

**10.** We view good faith, in this context, as non-arbitrary and non-capricious actions of municipalities, and not as a heightened standard of behavior that city officials must meet in order to exercise authority under Minn.Stat. § 462.355, subd. 4(a).

**11.** In *Honn*, we noted that there is a distinction between zoning matters that are legislative in nature, such as enacting or amending a zoning ordinance, and matters that are quasi-judicial, such as zoning variances. *Honn*, 313 N.W.2d at 416–17. We said that "the standard of review is the same for all zoning matters, namely, ... is the decision 'unreasonable, arbitrary, or capricious?'" *Id.* But we also specified that "the nature of the matter under review has a bearing on what is reasonable." *Id.* at 417. That is, whether the matter involves a legislative or quasi-judicial decision has an impact on how we review the reasonableness of the decision. For the rea-

sonableness of a legislative act, we look at whether it is "reasonably related to the *promotion* of the public health, safety, morals or general welfare." *Id.* If a contesting party demonstrates that there is no rational basis relating to the promotion of the public health, safety, morals, or general welfare, or that the act is arbitrary and capricious, we may override such an action. *See State, by Rochester Ass'n of Neighborhoods v. City of Rochester*, 268 N.W.2d 885, 888 (Minn.1978); *Almquist*, 308 Minn. at 63, 65, 245 N.W.2d at 825–26. The enactment of an interim ordinance, such as the one at issue here, is a legislative act. *See Interstate Power Co., Inc. v. Nobles County Bd. of Comm'rs*, 617 N.W.2d 566, 574 (Minn. 2000) (stating that "[a]mendment of a zoning ordinance is a legislative act"); *Honn*, 313 N.W.2d at 417 (stating that the enactment of a zoning ordinance is a legislative act).

or whether it is unreasonable, arbitrary, or capricious.

The thrust of Pawn America's argument is that the City acted arbitrarily and impermissibly by aiming its actions only at Pawn America. Pawn America relies heavily upon the court of appeals' decision in *Medical Services, Inc. v. City of Savage,* 487 N.W.2d 263, 267 (Minn.App.1992), where the court, citing *Almquist,* stated that "[a] municipality may not arbitrarily enact an interim moratorium ordinance to delay or prevent a single project," and struck down an interim ordinance as arbitrary.

The court of appeals opinion in *Medical Services,* however, besides only having persuasive authority, is distinguishable. Unlike the city council in *Medical Services,* which delayed in acting for nearly two years before enacting an interim moratorium ordinance, *id.* at 267, the city council here only became aware of Pawn America's plans in late September 2007.[12] At the October 1 meeting, the city council authorized a zoning study of pawnshops and passed the interim ordinance. In further contrast to *Medical Services, see id.,* neither the interim ordinance nor the zoning study was part of a litigation strategy here because Pawn America had not yet brought an action against the City.

The City does not deny that Pawn America's plan to open a pawnshop prompted the adoption of the interim ordinance. But awareness of one particular application does not, in itself, make the City's actions arbitrary or unreasonable. *See Duncanson,* 551 N.W.2d at 252 ("[T]he

good faith effort demonstrated here to plan for orderly development ... must ... defeat any objection that this ordinance is directed at a single project."). The City had not previously conducted a zoning study of pawnshops in order to analyze the land use impact of pawnshops and to determine if the City should place additional restrictions on opening pawnshops.[13] A review of the October 1 city council minutes reveals the city council's concern about pawnshops in general and the council's consensus that there should be a moratorium on opening new pawnshops in the entire City, not just on the property at issue, until further study could be done and long-term decisions made concerning limitations on the number of pawnshops, limitations on the sale of firearms, and the location of pawnshops. Based on the wording of the interim ordinance itself, it appears that the City sought to make informed decisions for the long-term welfare of the City and wanted sufficient time to deliberate. The interim ordinance, which was in effect for only four months, stated:

> There are substantial concerns that the current City zoning ordinance provisions relating to pawnshops do not adequately address issues relating to pawnshops, such as the appropriate locations and the conditions under which they may be allowed within the City, including compatibility with existing uses in the area. There are also concerns about the land use impacts of the combination of pawnshop uses with other uses at the same location such as a secondhand goods store, precious metal dealer, and bank-

---

12. Although some city staff members were aware of Pawn America's pawnbroker license application beginning on June 7, 2007, there is no indication that anyone on the city council knew of the application until September 21, 2007.

13. The City had amended the pawnbroker licensing ordinance in 2002 to implement a reporting system between pawnshops and police for stolen property, and the City had lowered the number of available licenses from three to two, but there was no comprehensive zoning study of pawnshops.

ing and/or lending type uses. As a result of the important land use and zoning issues cited above, the City Planning staff will conduct studies for the purpose of consideration of possible amendments to the City's official controls to address the issues concerning pawnshops. The City finds that this Interim Ordinance must be adopted to protect the planning process and the health, safety and welfare of the citizens.

Further, the City did in fact complete the study on December 5, 2007, and adopted a permanent ordinance on February 4, 2008, based on that study. These facts support the conclusion that the City was not acting arbitrarily. *See Almquist,* 308 Minn. at 65, 245 N.W.2d at 826 (placing importance on whether "the study proceeds promptly and appropriate zoning ordinances are expeditiously adopted when it is completed"). If we were to view the City's preservation of the status quo pending further study as constituting unreasonable, arbitrary, or capricious action, any city's use of Minn.Stat. § 462.355, subd. 4(a), would be presumptively questionable.

At the same time, there is little doubt that there was hostility about locating a pawnshop at Pawn America's proposed site. And there is no doubt that the City also intended the interim moratorium to apply to Pawn America. In fact, prompted by Pawn America's application for a pawnbroker license and attempt to open a pawnshop at the property, the City took specific measures to ensure that the interim ordinance became effective as soon as possible. Nevertheless, nothing in the statute precluded the City from adopting the interim ordinance when the City knew that the ordinance would affect only one particular entity—Pawn America—and further, nothing in the statute prevented the City from adopting the interim ordinance in an effort to preserve the status quo in response to Pawn America's pending application. Had the City enacted the interim ordinance and adopted a permanent ordinance without conducting a study, a different result might very well obtain.

We conclude that the interim ordinance here was not unreasonable, arbitrary, or capricious, even though one of the purposes of the interim ordinance appears to have been to temporarily prevent Pawn America from operating a pawnshop at the property. Although the Pawn America application undoubtedly prompted the City's concern about pawnshops and the City took steps to preserve the status quo, the record indicates that the City adopted the interim moratorium ordinance not merely because of Pawn America, but to protect the City's planning process with respect to pawnshops in the City in general, and to examine the impact of pawnshops on the health, safety, and welfare of its citizens.[14] The City promptly proceeded with a study, and enacted a permanent ordinance based on the findings of that study. Because of this broader purpose of protecting the planning process and the health, safety and welfare of its citizens, the City's actions were not unreasonable, arbitrary, or

---

**14.** The zoning study was authorized in October 2007 and completed on December 5, 2007. The study appears to have been more than merely a formality; it involved examining the City's regulations and those of 13 other nearby cities; reviewing Minnesota statutes relating to pawnshops; visiting pawnshops in and near the City; analyzing literature regarding the operations of pawnshops, and trends and impacts on surrounding properties; reviewing data from law enforcement; and looking at related uses. The results of the study are detailed in a 21–page report, with specific recommended changes to the City's zoning requirements for pawnshops. The recommended changes formed the basis of the City's permanent ordinance passed in February 2008.

capricious, and the interim ordinance was valid.

Because we conclude that the City's interim moratorium ordinance was validly enacted, thereby placing a moratorium on the issuance of pawnbroker licenses, and under the current ordinance Pawn America does not meet the conditions for a pawnbroker license at the requested location, we hold that the district court did not err in concluding that the City is not required to issue a pawnbroker license to Pawn America.

Affirmed.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.